IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2001 Session

# STATE OF TENNESSEE v. DARRYL A. LARKINS

**Appeal from the Criminal Court for Davidson County**
**No. 98-D-2577     J. Randall Wyatt, Jr., Judge**

---

**No. M2000-00249-CCA-MR3-CD - Filed May 23, 2001**

---

A Davidson County jury convicted the defendant, Darryl A. Larkins, of two counts of aggravated rape, two counts of especially aggravated kidnapping, one count of attempted aggravated rape, and one count of aggravated burglary. The trial court sentenced the Defendant as a Range I offender to serve an effective sentence of fifty-years of incarceration. On appeal, the Defendant raises the following issues for our review: 1) whether the evidence was sufficient to convict the Defendant of aggravated rape and attempted aggravated rape; 2) whether the especially aggravated kidnapping convictions were obtained contrary to Tennessee law in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991); and 3) whether the Defendant was denied his constitutional rights to a fair trial and a fair and impartial jury, regarding the aggravated burglary conviction. The judgment of the trial court is hereby affirmed in part and reversed in part, and remanded to the trial court for re-sentencing on the offense of attempted aggravated rape.

**Tenn. R. App. P. 3 Appeal As Of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part; Remanded For Re-Sentencing**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Dwight E. Scott, Nashville, Tennessee (on appeal); William R. Roberts, Shelbyville, Tennessee (at trial), for the appellant, Darryl A. Larkins.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Davidson County Grand Jury returned a six-count indictment against the Defendant, Darryl Larkins, charging the following offenses:

| Count I | Aggravated Rape |
|---|---|
| Count II | Aggravated Rape |
| Count III | Especially Aggravated Kidnapping |
| Count IV | Especially Aggravated Kidnapping |
| Count V | Attempted Aggravated Rape |
| Count VI | Aggravated Burglary. |

A jury convicted the Defendant of the charges in Counts I through VI. The trial court sentenced the Defendant to twenty-five years each for Counts I and II, with Count II to be served concurrently with Count I. The trial court merged count III into Count I and sentenced the Defendant to twenty years for Count IV, which was to be served consecutively to Count I. The trial court merged Count V into Count IV, and sentenced the Defendant to five years for Count VI, which was to be served consecutively to Count IV. The trial court ordered the Defendant to serve an effective sentence of fifty years in the Tennessee Department of Correction. Subsequently, Defendant filed a motion for a new trial, which the trial court denied. Thereafter, Defendant filed this appeal. After a review of the record, we affirm the judgment of the trial court.

## FACTS

On the morning of August, 13, 1998, Patricia Rucker was visiting at the home of her cousin, Gloria Edwards, at approximately 5:45 a.m. After talking for about fifteen minutes, the two women decided to drive down the street to use a pay phone and call Ms. Rucker's sister. Ms. Rucker was scheduled to be at her sister's house at 7:00 a.m., to ensure the safe boarding and departure of her sister's granddaughter on the school bus. Ms. Rucker called her sister and assured her that she would be there by 6:45 a.m.

As the two women returned to Ms. Edwards' home, they observed the Defendant and another man (later identified as Quincy Fitzgerald) walking past Ms. Edwards' home. Ms. Rucker parked the car in front of Ms. Edward's home, and as Ms. Edwards exited the car, the Defendant hollered her name from across the street and asked if she remembered him. Ms. Edwards acknowledged that she remembered the Defendant. Ms. Edwards continued toward her front door, followed by Ms. Rucker and the Defendant, who had crossed the street and began to follow the women into the house. The other young man remained on the sidewalk across the street.

Ms. Edwards unlocked the door of her home and the Defendant followed the women inside. Once in the house, the Defendant closed the door and pulled out a gun, which Ms. Rucker stated was small and looked like a .22 caliber pistol. The Defendant grabbed about $18, which was on a nearby coffee table, and asked the women if they had any more money, to which they responded no. Then, Defendant demanded that both women take off their clothes. Defendant told the women, "I want to "f--k." Defendant also claimed that he wanted someone to perform fellatio for him and that he wanted sex. The Defendant told the women to "Hurry up. Hurry up, before I blow your damn brains out." Both Ms. Rucker and Ms. Edwards testified that they were scared and afraid, and that they did not feel free to leave.

After the women had taken off their clothes, the Defendant pulled his pants and shorts below his knees and instructed Ms. Rucker to perform fellatio on him as he sat on the sofa. Ms. Rucker stated that she complied, because she was afraid Defendant would shoot her. After about a minute and a half, Defendant made Ms. Rucker lay on the floor and began having vaginal intercourse with her. Again, Ms. Rucker reluctantly complied. Ms. Edwards remained sitting in a chair, naked and too afraid to move.

While Defendant was having vaginal intercourse with Ms. Rucker, he laid the gun down, but warned Ms. Rucker, that if she touched the gun, he would "blow [her] damn brains out." At some point, Defendant closed his eyes and Ms. Rucker grabbed the gun. Ms. Rucker and the Defendant began wrestling for the gun. Ms. Edwards came to Ms. Rucker's aid, jumped on the Defendant's back and pulled him off of Ms. Rucker. The Defendant jumped up and ran into Ms. Edwards' bedroom holding his pants. As Defendant ran, Ms. Rucker fired two shots at him, but the gun jammed and prevented her from firing anymore shots at that time.

Ms. Edwards put on her clothes and went next door and asked her neighbor, Michael Taylor, to call the police. Ms. Edwards noticed that the Defendant was trying to escape through her bedroom window, and Ms. Rucker went outside and fired a shot at the Defendant to keep him from fleeing. At some point, the police arrived and arrested the Defendant. Ms. Rucker was taken to General Hospital for an examination. Ms. Rucker testified that she believed that the Defendant had ejaculated, because she felt "wet." She explained that she felt no tears or bruises in her vagina, because the "leaking" or early ejaculation from the Defendant had lubricated her vagina prior to penetration by the Defendant. The physical examination of Ms. Rucker revealed no signs of a physical struggle, although Ms. Rucker stated that she had scratches on her hand from wrestling to get the gun from the Defendant. At the hospital, a blood sample was taken from Ms. Rucker, and she tested positive for cocaine. Ms. Rucker admitted to using cocaine two weeks prior to this incident, but stated that she had only used the cocaine two or three times, as a concerned parent, in an attempt to understand her son's drug problem. Ms. Rucker further admitted that she did not tell the police or the medical personnel at the hospital about her use of cocaine, because she did not think it was relevant to her being raped. Ms. Rucker stated that vaginal intercourse with the Defendant had not been consensual and that she had never seen the Defendant nor bought drugs from him or anyone else in front of Ms. Edwards' home.

Gloria Edwards' testimony corroborated that of Ms. Rucker. Ms. Edwards further testified that she saw Ms. Rucker and the Defendant struggling for the gun, but she did not see Ms. Rucker struggling while the Defendant was having vaginal intercourse with Ms. Rucker. Ms. Edwards stated that she had seen the bleeding scratches on Ms. Rucker's hands. Ms. Edwards told the jury that she neither saw Ms. Rucker using cocaine the morning of this incident, nor had she ever seen Ms. Rucker using cocaine. Ms. Edwards also admitted that she had failed to tell the police about the $18 taken by the Defendant.

Officer Bobby Ratley testified that he was the first officer to arrive at Ms. Edwards home. When he arrived, Officer Ratley observed the Defendant attempting to crawl out of a window. He

3

helped the Defendant out of the window, cuffed him and placed the Defendant in the back of the patrol car. Officer Ratley testified that both victims appeared upset and that Ms. Rucker was partially clothed. Ratley further testified as to the facts related to him by the victims, regarding the rape, which corroborated the victim's testimonies. On cross-examination, Ratley said that the victims explained to him that the Defendant had led them into the house at gun point. On redirect and re-cross, Officer Ratley acknowledged that his report did not state that the victims were taken into the house at gun point, and that he had mistakenly testified that they were taken in at gun point. He further testified that neither of the women had mentioned anything to him about the Defendant stealing $18.

Officer Raymond Raider testified that he was called to collect evidence at the scene of the crime. He received a .22 caliber pistol, plus six live rounds and three spent casings from the pistol. Officer Raider performed a black light test on the area of the floor where the Defendant was reported to have had sex with Ms. Rucker. Raider also performed the black light test on the love seat where the Defendant had Ms. Rucker perform fellatio on him. The black light test revealed no traces of semen in these designated areas.

Charles Jackson testified that, on the morning of these offenses, he heard shots fired and went to Ms. Edwards' home. Jackson stated that he saw a man hanging out of the window to Ms. Edwards' apartment. Jackson also testified that Ms. Edwards appeared to be upset. Ms. Edwards asked him to call 911 and he did.

Sandy Myers testified that she performs "medical-legal" examinations at Meharry and General Hospitals. She explained that she was one of a group of nurse practitioners who perform gynecological exams on victims of rape and sexual assault charges. She further stated that the purpose of the exam is to "examine the patient medically, and treat them for any possible diseases or potential pregnancy as a result of the assault, and to collect evidence." Myers testified that she has been called to testify, as to the result of a medical-legal exam, in three prior cases.

Myers testified that she performed an examination of Ms. Rucker following the rape in this case. She stated that Ms. Rucker said that her last consensual sex relationship had been two or three years prior to the examination. Myers took a urine and blood specimen from Ms. Rucker, and performed a "woods light" examination of Ms. Rucker's thighs and vaginal area. Myers also performed several other tests for the purpose of producing a rape kit. No sperm was detected from any of these tests, but Ms. Rucker tested positive for cocaine. Myers stated that she found no signs of physical trauma on any part of Ms. Rucker's body. She explained that most rape victims do not show signs of physical trauma to the vaginal area. Myers noted that Ms. Rucker did not mention the scratching and bleeding on her hands, for if Ms. Rucker had, she would have written this information in her report. She further testified that she was unable to determine whether Ms. Rucker had engaged in consensual or non-consensual sex with the Defendant. Myers also stated that she routinely asked patients about whether they were taking any prescribed medicines, but not whether they used illegal drugs.

Sharon Jenkins, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that she tested throat and vaginal swab samples taken from Ms. Rucker. She told the jury that she detected sperm and semen on both the throat and vaginal slides. Jenkins also stated that she was not initially asked to perform a DNA test, but a DNA test was later requested and performed by Constance Howard, another forensic scientist with the TBI. Constance Howard testified that she performed a DNA test on a blood sample taken from the Defendant and on the sperm and semen found on the throat and vaginal swabs collected from Ms. Rucker. The test performed by Howard indicated that the Defendant was the depositor of the semen found on the vaginal swab taken from Ms. Rucker. However, Howard stated that the only DNA detected from the throat swab was that of Ms. Rucker.

The State rested its case-in-chief at this point.

The Defendant testified that he and his friend, Quincy Fitzgerald, were walking down the street, when the two victims drove by and waived them over to the car and asked "[d]o ya'll got some?" Defendant testified that he understood the women to be asking for cocaine. He made the women believe he had some cocaine for them. The women did not have any money, so they agreed to exchange sex for cocaine. The Defendant followed the women into Ms. Edwards' home.

Upon entering the house, Defendant placed his gun on a table to establish the women's trust. The Defendant and Ms. Rucker went into the kitchen and she performed fellatio on him, but that was taking too long, so they started having vaginal intercourse. After they finished, Ms. Rucker began putting on her clothes and the Defendant sat on the couch tying his shoes. Ms. Rucker asked to see the drugs, but Defendant told her that he did not have any drugs, only some money. Ms. Rucker grabbed Defendant's gun and called Ms. Edwards to help her. The gun fired and Defendant ran into the bedroom. Ms. Rucker threatened to kill him, so he attempted to go through the bedroom window, but she fired at him again. The Defendant asked Quincy Fitzgerald to call the police. Ms. Rucker asked Defendant to "throw the dope out the window," and again he told her he did not have any cocaine. Then, Defendant found a plastic bag in the bedroom and threw it out the window to make Ms. Rucker think it was some cocaine. A person named "Punky" picked up the bag and said that there was no cocaine in the bag.

When the police arrived, the gun was sitting on the air conditioner outside Ms. Edwards' home. The Defendant ran to them and attempted to explain what had happened. He told the police that he was invited into the house and had not threatened either of the women. He testified that he was carrying a gun because he had been threatened by someone else and needed the gun for protection. The Defendant stated that he did not take any money from either of the women and that he did not force Ms. Edwards to take off her clothes. Defendant further testified that Ms. Rucker had consensual sex with him, because she thought she was going to get some drugs in return.

On cross-examination, Defendant admitted to giving inconsistent statements about whether he had sex with Ms. Rucker. The Defendant explained that he gave Detective Brad Johns different stories because he was afraid, and the detective was threatening him. Later, Defendant told

Detective Johns the truth. He stated that he and Quincy Fitzgerald had been up all night, but that they had not used any drugs or drank any alcohol. The Defendant said that he had $17 dollars on the day of this incident.

Quincy Fitzgerald testified that, on the morning of this incident, he and the Defendant were walking down the street when a blue Ford Taurus, with the two victims inside, approached them. The women honked their horn, drove to the end of the street, turned around and parked in front of Ms. Edwards' home. The Defendant talked with the women, but Fitzgerald could not hear what they were saying. The exchange between the Defendant and the women did not appear to be angry; they were just talking. Then, the Defendant and the two women went into Ms. Edwards' house. Fitzgerald testified that he sat on the porch of Ms. Edwards' home with a female and waited for the Defendant. At some point, he heard a gunshot. He panicked and ran down the street, but came back to find the Defendant coming out of a window in the house. Ms. Rucker had a gun pointed at the Defendant. When the police arrived, he gave a statement about what he had seen.

On cross-examination, Fitzgerald testified that he and the Defendant had used some drugs the night before the incident, but stated that his perception was not hampered by the drugs. He also stated that the Defendant was asking for help as he was trying to come out the window.

At this point, the defense rested and the State called Detective Brad Johns as a rebuttal witness. Detective Johns testified that he had interviewed the Defendant regarding this incident. The Defendant denied taking a gun into the house and said that the gun belonged to one of the victims.

At the close of the proof, the case was submitted to the jury. The jury ultimately convicted the Defendant on all counts of the indictment. However, in Count VI on the jury verdict form, the jury initially indicated that the Defendant was guilty of attempted aggravated burglary due to a mistake on the verdict form. The original charge for Count VI was aggravated burglary. Attempted aggravated burglary was *not* charged to the jury as a lesser-included offense. The trial court did not accept a verdict on Count VI at that time, but instructed the jury to re-deliberate as to Count VI and to follow the previous jury instructions. After re-deliberating, the jury found the Defendant guilty of aggravated burglary. Subsequently, the trial court sentenced the Defendant to an aggregate sentence of fifty years in the Tennessee Department of Correction.

## ANALYSIS

### A. Sufficiency of the Evidence

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). We afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be

drawn from the evidence. State v. Keough, 18 S.W.3d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses; the weight to be given the evidence; and any factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### 1.      Aggravated Rape of Ms. Rucker

The Defendant first contends that the evidence was insufficient to sustain his convictions for the two counts of aggravated rape against Ms. Rucker. We disagree.

To establish that the Defendant was guilty of aggravated rape, the State was required to prove that the Defendant unlawfully sexually penetrated the victim, that force or coercion was used to accomplish the act, and that the Defendant was armed with a weapon. See Tenn. Code Ann. § 39-13-502(a)(1). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

Ms. Rucker testified to two different acts of sexual penetration by the Defendant: one orally and one vaginally. Ms. Rucker testified that the Defendant threatened her with a gun and ordered her and Ms. Edwards to take off their clothes. She testified that the Defendant made her perform fellatio on him. Rucker explained that Defendant was not satisfied with fellatio and made her lay on the floor, where he inserted his penis into her vagina without her consent and began having intercourse with her. Ms. Rucker also testified that, while Defendant was having intercourse with her, Defendant threatened to blow her brains out if she tried to get the gun Defendant was using against her and Ms. Edwards. Based upon this testimony, the State showed two separate acts of unlawful sexual penetration, which are sufficient to sustain Defendant's convictions for aggravated rape.

The Defendant's attack on the sufficiency of the evidence basically addresses whether the acts involved in the rape of Ms. Rucker were consensual. He argues that Ms. Rucker's testimony concerning the rape was "contradictory and transparently deceitful." In particular, he notes that the examination performed on Ms. Rucker following the rape did not reveal any signs of physical trauma. The Defendant also relies on Ms. Edwards' testimony that Ms. Rucker was not struggling with the Defendant during the rape. Also, Defendant contends that Ms. Rucker's testimony that she experienced some vaginal moisture during the rape, showed signs of willing participation on the part of Ms. Rucker. Defendant further points to Ms. Rucker's confessed use of cocaine, to corroborate the Defendant's story that Ms. Rucker had offered him sex in exchange for some drugs. The Defendant, in effect, argues that the jury should have believed his testimony, and not that of Ms. Rucker and Ms. Edwards. However, it is well-established that questions regarding the credibility of the witnesses, the weight and value to be given to the evidence, as well as any conflicts raised by the evidence are resolved by the trier of fact and not this court. See State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). Thus, Defendant is not entitled to relief on this issue.

**2.        Attempted Aggravated Rape of Ms. Edwards**

The Defendant asserts that the evidence is insufficient to support his conviction for the attempted aggravated rape of Ms. Edwards, because there is no evidence that he took a substantial step toward the completion of the crime. We disagree.

The law of criminal attempt is codified at Tenn. Code Ann. § 39-12-101. The statute provides in pertinent part that:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part;  or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the to commit the offense.

Tenn. Code Ann. § 39-12-101(a) & (b) (1997).   As alleged in the indictment, the offense of attempted aggravated rape requires proof of the following elements:  1) the defendant acted with a culpable mental state, i.e., intentionally, knowingly, or recklessly;  2) the defendant engaged in conduct constituting a substantial step toward commission of the crime, i.e., attempted to forcibly or coercively engage in sexual penetration; and 3) the defendant used a weapon or any article used or fashioned in a manner to lead the victim to believe it to be a weapon. See Tenn. Code Ann. § 39-11-301 (culpable mental state); Tenn. Code Ann. § 39-12-101 (attempt); Tenn. Code Ann. § 39-13-502 (a)(1) (aggravated rape).

We believe that the evidence is sufficient to support the Defendant's conviction for attempted aggravated rape. Taken in the light most favorable to the state, the evidence shows that the Defendant, brandishing a gun, forced each victim to take off her clothes so that he could have sex with them. Ms. Edwards testified that she sat in a chair, naked and too afraid to move, while the Defendant first had vaginal intercourse with Ms. Rucker. Though the Defendant's attempt to rape both women was thwarted by Ms. Rucker's gaining possession of the gun, a rational trier of fact could conclude that the Defendant's actions showed an intent to commit aggravated rape and

8

constituted a substantial step toward that end. Also, since Defendant's attempted aggravated rape conviction was merged into his conviction for the especially aggravated kidnapping of Ms. Edwards (which is dismissed herein), we must remand this conviction for re-sentencing.

## B. Especially Aggravated Kidnapping Conviction In Light of Holding in <u>Anthony</u>

Next, the Defendant argues that the confinement of the victims was essentially incidental to the accomplishment of the aggravated rape and attempted aggravated rape, and was therefore insufficient to support the separate convictions for especially aggravated kidnapping. In <u>State v. Anthony</u>, the Tennessee Supreme Court gave attention to cases in which the offense of kidnapping is inherent in another felony growing out of a single episode, making the kidnapping incidental to the other felony. <u>State v. Anthony</u>, 817 S.W.2d 299 (Tenn. 1991). The supreme court held that separate convictions for kidnapping and robbery violate due process, "where the detention of the victim resulting in the kidnapping conviction is incidental to the robbery." <u>See</u> <u>State v. Beauregard</u>, 2000 WL 1752564, at *4 (Tenn. 2000) (citing <u>Anthony</u>, 817 S.W.2d at 306). In making its determination, the supreme court in <u>Anthony</u> observed that "every robbery, by definition, involves some detention against the will of the victim, if only long enough to take goods or money from the person of the victim. This does not mean that the legislature intended that every robbery should also constitute a kidnapping, even though a literal reading of the statute might suggest otherwise." <u>Anthony</u>, 817 S.W.2d at 306.

The Court in <u>Anthony</u> also adopted the "essentially incidental" test used in other jurisdictions for determining whether due process principles support separate convictions for two or more felonies springing from one episode of interconnected criminal conduct. The supreme court explained that lower courts considering this issue should examine

> whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping. . . . [O]ne method of resolving this question is to ask whether the defendant's conduct "substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself."

<u>Anthony</u>, 817 S.W.2d at 306. Moreover, the <u>Anthony</u> court, while recognizing the aberrant nature of the kidnapping statutes, warned that such statutes should be narrowly construed. <u>Id.</u>, at 306. The Court further suggested that the "essentially incidental" analysis was more appropriate in kidnapping cases involving rape or robbery, where confinement of the victim is a necessary aspect of the rape or robbery. <u>Id.</u>, at 300. As a result, the defendant in <u>Anthony</u> had his six convictions for aggravated kidnapping dismissed.

Later, in <u>State v. Dixon</u>, 957 S.W.2d 532 (Tenn. 1997) our supreme court clarified the ruling in <u>Anthony</u> by stating that:

9

The Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

Id., at 534-35. The Court set forth a two-part test for determining whether a separate kidnapping conviction violates due process. The first question is "whether the movement or confinement was beyond that necessary to consummate" the associated felony. Id. at 535. If that question is answered affirmatively, then the second question is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. If both parts are met, then the two separate convictions do not violate due process. See id.

The anomalous concerns in Anthony are applicable to the instant case. The Defendant contends that the separate convictions for especially aggravated kidnapping violate due process principles. In response, the State asserts that this issue was settled by the trial court, when it merged Defendant's conviction for the especially aggravated kidnapping of Ms. Rucker into the conviction for the aggravated rape of Ms. Rucker. The trial court also merged the Defendant's conviction for the attempted aggravated rape of Ms. Edwards into his conviction for the especially aggravated kidnapping of Ms. Edwards.

Like the robbery and aggravated kidnapping convictions in Anthony, the especially aggravated kidnapping convictions in this case were "essentially incidental" to the aggravated rape and attempted aggravated rape offenses. First, the "movement or confinement" of the victims was not beyond that necessary to consummate the aggravated rape and attempted aggravated rape. That is, proof of the aggravated rape, necessarily proved the unlawful confinement of Ms. Rucker at gunpoint. Similarly, proof of the attempted aggravated rape, necessarily proved the unlawful detention of Ms. Edwards with a gun. Thus, our answer to the first inquiry of the Dixon two-part test cannot be answered in the affirmative, thereby negating further inquiry.

However, we note that the proof does not indicate that the Defendant's conduct substantially increased the risk of harm to these victims over and above that inherently involved in either aggravated or attempted aggravated rape. In this case, the burglary and rape began with the detention of the two victims inside Ms. Edwards' home, and there was neither a break in the Defendant's rape of Ms. Rucker nor his attempted aggravated rape of Ms. Edwards to support separate convictions for especially aggravated kidnapping. The Defendant's movements were confined to Ms. Edwards' home, thereby defeating any claims that the risk of harm to the victims was greater than that associated with the aggravated rape.

We therefore conclude that the Defendant's separate convictions for especially aggravated kidnapping violate the principles of due process and must be reversed and dismissed, rather than merged. See, Anthony, 817 S.W.2d at 299 (holding that dismissal of defendant's six aggravated

kidnapping convictions was required, where the kidnappings were incidental to the aggravated robbery convictions); State v. Binion, 947 S.W.2d 867, 872-73 (Tenn. Crim. App. 1996)(upholding trial court's dismissal of defendant's especially aggravated kidnapping conviction where the defendant was also convicted of attempted aggravated rape); State v. Gregory, 862 S.W.2d 574, 579 (Tenn. Crim. App. 1993)(holding trial court's grant of defendant's motion for judgment of acquittal on the defendant's conviction for aggravated kidnapping was proper under Anthony); State v. Luster, No. 02C01-9201-CR-00019, Shelby County, 1992 WL 345443 (Tenn. Crim. App., Jackson, November 25, 1992), no perm. to appeal filed (applying Anthony to reverse and dismiss the defendant's conviction for aggravated assault where it was incidental to defendant's conviction for aggravated rape).

### C. Denial of Right to a Fair Trial

In his final issue, Defendant argues that the trial court committed plain error when it instructed the jury on how long it should deliberate regarding Count VI of the indictment, aggravated burglary. Defendant claims that this error denied him the right to a fair trial under the Fifth and Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution.

We note, and the Defendant concedes, that he has waived this issue for failing to include it in his motion for new trial. Tenn. R. App. P. 3(e); State v. Howell, 868 S.W.2d 238, 255-56 (Tenn. 1993). Yet, the Defendant asks this Court to find plain error in the trial court's instruction to the jury on Count VI of the indictment. This Court has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial:

(1)     the record must clearly establish what occurred in the trial court;
(2)     a clear and unequivocal rule of law must have been breached;
(3)     a substantial right of the accused must have been adversely affected;
(4)     the accused did not waive the issue for tactical reasons;  and
(5)     consideration of the error is 'necessary to do substantial justice.'

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim .App. 1994).   All five factors must be established by the record before this Court will recognize the existence of plain error. See State v. Smith, 24 S.W.3d 274, 283 (adopting the Adkisson test for determining when plain error exists). Additionally, the " 'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

The record indicates that, at the conclusion of the trial, the trial judge instructed the jury on each count of the indictment and the jury left to deliberate. At some point, the jury returned with its verdict as to each count. As the jury foreman read the verdict for Count VI, the trial court noticed, for the first time, that the jury verdict form asked whether the jury found the Defendant guilty or not guilty of *criminal attempt to commit aggravated burglary*, rather than *aggravated burglary*. Specifically, the following transpired:

THE COURT:          Yeah, but what I'm saying is this is just -- I don't know how
                    it got by me. The Charge in count VI was really aggravated
                    burglary. That was what the charge was. So, I'm going to
                    have to -- this -- this verdict form here that you used, it is the
                    same as the one I'm looking at that I let this slip by me,
                    wasn't exactly the charge that was cited in Count VI. And so
                    if you would go back and use the charge as the basis of what
                    the offense was and just deliberate here for just a short time --
                    I think you've reached a verdict, but I need you to state, rather
                    than me telling you what it would be, what the --

JURY FOREPERSON:         Charge is.
THE COURT:          -- charge is in the indictment and in the Jury instruction, and
                    on this one count, just disregard the verdict form and just state
                    your verdict as to whether it's guilty or not guilty and what
                    the offense is. So just step back upstairs for five minutes and
                    do that.
                              *        *        *
THE COURT:          Okay. Let's just take about a five minute recess or whatever
                    it would take. I think the jury has reached a verdict and they
                    need to, for the record, state exactly what that verdict is.


The verdict form at issue was as follows:

        Count VI, Aggravated Burglary of the habitation of the alleged
victim, Gloria Edwards. Check one:


        Not Guilty                                    _____


        Or


        Guilty of Criminal Attempt
        To Commit Aggravated
        Burglary                                      _____


        When a jury returns an incorrect or imperfect verdict, the trial court has both the power and
the duty to send them back to the jury room with directions to amend the verdict to put it in the
proper form. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). Here, the record reflects that the
jury returned a verdict finding the Defendant guilty of criminal attempt to commit aggravated
burglary. After finding error with the original judgment form, the judge sent the jury back to
deliberate on whether the Defendant was guilty of aggravated burglary. The judge emphasized to
the jury that the only charge under Count VI was aggravated burglary, and that there were no lesser-

12

included offenses charged. The jury was admonished to rely upon the original jury charge. According to the transcript of the proceedings, the jury left the courtroom at 3:10 p.m. and returned at 3:15 p.m.

The Defendant contends that the trial court's second instructions to the jury, pertaining to Count VI, amounted to the trial court interjecting itself into the jury deliberation process. Defendant argues that the trial court's remarks not only suggested the length of time the jury should spend deliberating (the second time), but also suggested that the jury had already reached a verdict as to Count VI of the indictment. We find that the remarks did not constitute an "undue intrusion . . . into this exclusive province of the jury. . . ." Kersey v. State, 525 S.W.2d 139, 144 (Tenn. 1975); see also State v. Goad, 707 S.W.2d 846, 851 (Tenn. 1986). From the record, it appears that the trial court did not instruct, or suggest to the jury that it should find the Defendant guilty or not guilty of aggravated burglary. The trial court merely instructed the jury to follow the prior jury charge and indicate whether they found the Defendant guilty or not guilty. Also, the jury had a right to correct the verdict form after receiving proper instructions from the trial judge.

Moreover, the trial judge did not limit the jury to taking only five minutes to re-deliberate. Rather, the trial court stated that the jury to take about five minutes "or whatever it would take" for them to reach a verdict. This Court has stated that "[t]he length of a jury's deliberation has no bearing on the strength or correctness of [its] verdict or the validity of [its] verdict." State v. Gray, 960 S.W.2d 598, 605 (Tenn. Crim. App. 1997) (finding no misconduct when jury deliberated for only one hour). See also State v. Spafadina, 952 S.W.2d 444, 451 (Tenn. Crim. App. 1996) (forty-nine minute deliberation); State v. Caldwell, 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983) (twenty-six minute deliberation); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977) (ten minute deliberation). Here, the jury had properly deliberated over the charge of aggravated burglary, as it was charged in the original jury charge. Moreover, it was the jury's prerogative to decide to either deliberate longer or to determine that the Defendant was not guilty of aggravated burglary, which it declined to do. Thus, we find no evidence of plain error or a violation of Defendant's due process right to a fair trial.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse the convictions for the offenses of especially aggravated kidnapping in Counts III and IV. We affirm the remainder of the Defendant's convictions and remand the case for a determination of the appropriate sentence for Defendant's attempted aggravated rape conviction.

_____
THOMAS T. WOODALL, JUDGE

13