STATE of Tennessee, Appellee,

v.

Michael Joseph SPADAFINA, Appellant.

Court of Criminal Appeals of Tennessee, at Jackson.

Dec. 31, 1996.

Pemission to Appeal Denied by Supreme Court July 21, 1997.

Terry J. Leonard, Camden, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, William David Bridgers, Asst. Atty. Gen., Nashville, Robert "Gus" Radford, Dist. Atty. Gen., Todd A. Rose, Asst. Dist. Atty. Gen., Paris, for appellee.

## OPINION

PEAY, Judge.

The defendant was indicted on February 6, 1995, for the murder of Paul Burns. After a three day trial, the jury convicted him of first-degree murder but was unable to reach a decision as to the punishment. The trial court, therefore, sentenced the defendant to life imprisonment.

In this appeal as of right, the defendant raises the following seven issues [1]:

1. The evidence was insufficient to justify a finding of guilt beyond a reasonable doubt.

2. The jury's verdict was based upon passion and prejudice against the defendant.

3. The court erred by failing to admonish the State for improper remarks made during closing argument.

4. The court erred by refusing to grant the defendant's request for a recess following a lengthy direct examination and prior to an expected lengthy cross-examination of a key witness.

5. The court erred by admonishing the defendant in the presence of the jury.

6. The court erred by not charging the jury on the lesser included offense of facilitation of first degree murder.

7. The court erred in not finding the defendant was prejudiced when two of the sequestered jurors left the hotel where they were being sequestered and when the jurors discussed the case prior to its conclusion.

We find that the defendant's issues are without merit and his conviction is therefore affirmed.

On December 15, 1994, a child looking out his school bus window discovered a body lying atop an embankment along Mt. Carmel Road in Benton County. Police and medical personnel arrived shortly thereafter and found a man lying face down with his arms stretched above his head. His neck had been almost completely severed. A hotel key to a

room at Wismer Motel was the only item in the victim's pockets.

Benton County Sheriff Bobby Shannon and another officer went to the motel and spoke to Brenda Burns who identified the key as belonging to her ex-husband, Paul Burns. Ms. Burns gave the officers a description of her ex-husband, and from the description, the officers determined that the unidentified body was likely Paul Burns. Ms. Burns told the officers that she had last seen the victim with the defendant and Vito Licari.

Shortly thereafter, the sheriff's office picked up Licari who was walking along Mt. Carmel Road carrying a large suitcase. When questioned about the defendant's whereabouts, Licari told officers that the defendant was taking an employment test in nearby Humphreys County. The defendant was located and taken into custody a few hours later. Both Licari and the defendant were then questioned about the death of the victim.

In his first statement to the police, Licari denied knowing anything about the murder. In the defendant's first statement to the police, he said that he, Licari and the victim had been in the victim's motel room when Licari began asking the victim for money. He further stated that Licari had then suggested that he (Licari) and the victim take a ride and that the two then left while the defendant had stayed in the room. According to the defendant, Licari returned alone a short time later and refused to say what had happened to the victim.

Upon obtaining the defendant's initial statement, the officers placed him in the same room as Licari and asked the defendant to repeat his version of the events. After doing so, both the defendant and Licari asked to make new statements. The two were then separated and Licari then claimed that he and the defendant together had murdered the victim. The defendant's new statement was that he had been in the car at the time the victim was killed but that he had known nothing about Licari's intention to kill

**1.** Although the defendant's brief frames nine issues, the first, third and seventh issues actually comprise one distinct issue: the sufficiency of the evidence. As a result, we have merged these issues and will address the seven issues as they are numbered in this opinion.

the victim nor had he aided Licari in doing so.

The grand jury subsequently indicted the defendant and Licari for first-degree murder. Licari pled guilty to first-degree murder in exchange for the State's agreement to a sentence of life imprisonment.

At trial, the defendant testified that he and the victim had known each other for some years while the two lived in New York. The victim, upon being relocated under the Federal Witness Protection Program, asked the defendant to join him in Tennessee. The defendant, his girlfriend, and her children moved to Tennessee in the summer of 1994, and in August, the victim began living with them. In October, after being invited by the defendant, Licari left New York and moved in with the defendant and the others. Licari and the defendant had met while incarcerated in the New York state penitentiary.

Licari testified that some time in December he and the defendant had met with Brenda Burns to discuss killing the victim, Ms. Burns' ex-husband. Licari alleged that Ms. Burns had hated the victim and did not want to pay him fifty thousand dollars ($50,000) she owed him as a result of their divorce settlement. According to Licari, Ms. Burns had offered to pay Licari and the defendant a total of ten thousand dollars ($10,000) if they would kill the victim. The plan was that Ms. Burns make an initial payment prior to the killing and then follow with an installment payment of eight hundred dollars ($800) per month. Licari testified that he and the defendant had agreed to murder the victim but that the defendant had wanted to collect some money owed him by the victim before committing the murder.

Licari testified that in the fall of 1994, the defendant had intentionally set fire to the victim's house so that the victim could collect the insurance proceeds. In exchange for committing the arson, the defendant was to receive five thousand dollars ($5000) from the victim. According to Licari, the defendant had received a portion of the money but that the victim still owed him about two thousand three hundred dollars ($2300).

Licari testified that on the day of the murder, he had driven the victim to Henry County to appear in court on charges stemming from a "check kiting" scheme in which Licari said he, the defendant and the victim were involved. While he and the victim were in court, the defendant and Ms. Burns had picked up three insurance checks that were issued to the victim as a result of the fire. Licari testified that the three men had met back in the victim's motel room where the defendant had given the victim two of the three checks. Licari testified that the defendant had told the victim that the third check, which was for five thousand dollars ($5000), would have to be picked up the next day. Actually, the defendant and Ms. Burns already had possession of the third check.

From the two checks, the victim paid the defendant the balance owed for the alleged arson. As for the third check, Licari said the defendant and Ms. Burns had forged the victim's signature and cashed it. From this five thousand dollars ($5000), Ms. Burns paid the defendant one thousand five hundred dollars ($1500) to be shared with Licari as a downpayment on the murder. Licari received his share later that same day. At that point, Licari testified that the defendant had decided they must kill the victim that night because if they did not, he would start asking about the third check. Licari and the defendant decided to kill the victim while they were all in the defendant's car after the defendant gave the signal, "Now would be a good time."

On the night of the murder, the three men had dinner together, dropped some food off at the defendant's house, and then drove down Mt. Carmel Road in the defendant's station wagon. When the defendant gave the signal, Licari, who was in the backseat, reached around the passenger seat and tried to choke the victim with a clothesline. Licari testified that when he had begun this attempt, the defendant pulled the car off the side of the road. Licari was unsuccessful at his attempt to choke the victim because the clothesline was in the victim's mouth rather than around his neck. According to Licari, the defendant got out of the car, came around to the driver's side, and slashed the

victim's throat two or three times with a knife. Licari further testified that he and the defendant had then dragged the victim's body to the top of an embankment and left it there. The pair then went to a nearby carwash and sprayed the inside of the car with water in an effort to remove the blood. They also washed the blood from their shoes and from the knife. Licari then tossed the knife behind the carwash. According to Licari, the two had then returned to Wismer Motel where Ms. Burns washed their clothes.

Licari and the defendant then returned to the defendant's house where Licari told the defendant's girlfriend that a "problem" had been eliminated. Licari did not say that the victim had been murdered, but he did tell the girlfriend that the defendant had not been involved in eliminating the so-called problem.

On December 15, 1994, Licari and the defendant went to Henry County for another of the victim's scheduled court dates. When the victim's attorney questioned them as to the victim's whereabouts, the defendant said he did not know where the victim was and indicated that the victim may have run. Later that same day, Licari and the defendant were separately picked up for questioning and were subsequently charged with the murder of Paul Burns.

The defendant's version of the events is quite different. At trial, he testified that on the day of the murder he and Ms. Burns had picked up the insurance checks but that they had done so with the victim's permission. He further testified that he had given all three checks to the victim and had then taken the victim to the bank so that the victim could pay some outstanding debt. The defendant testified that the victim had given him two thousand two hundred dollars ($2200) to go toward a downpayment on the defendant's house, not as pay for an arson job as Licari had testified earlier. As for the third check, the defendant testified that the victim had asked Ms. Burns to sign his name to the check and then had asked that Ms. Burns and the defendant pay three thousand five hundred dollars ($3500) of the five thousand dollar ($5000) check on some other bank notes. The pair did as they were asked and then returned to the hotel with the remaining one thousand five hundred ($1500). The defendant testified that the victim had then given that money to Ms. Burns.

According to the defendant, he, the victim and Licari were later that evening riding in the defendant's car on Mt. Carmel Road. The defendant testified that he had suddenly heard the victim gagging in the seat next to him, and when he turned, he saw Licari choking the victim with a piece of cord. The defendant claimed that he tried to reach for the cord and as a result, ran his car off the side of the road. The defendant testified that Licari had then threatened him with a knife and demanded that he stop the car. He further testified that he stopped the car, got out, and began to leave the scene when Licari ordered that he return. When the defendant did so, he saw the victim fall out of the car. The defendant testified that Licari had threatened to kill him if he left and that Licari then pulled the victim's body to the top of the embankment.

The defendant testified that he and Licari had gone to the carwash and that they had returned to the Wismer Motel that night, but claimed that they had not seen Ms. Burns. He further testified that he and Licari had returned to their home and spent the night despite the fact that Licari had continued to make threats to kill the defendant. Over the next few days, the defendant testified that Licari had always been by his side. He further testified that he had been in fear for his and his family's safety and that because of this fear he had been unable to tell the police that Licari had killed the victim.

■ In his first issue, the defendant argues that the evidence is insufficient to support the jury verdict finding him guilty of first degree murder. He further argues that the evidence was insufficient to corroborate the testimony of Licari and that the jury ignored the impeachment of Licari by defense counsel.

■ A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient

evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973).

The rule is well settled in Tennessee that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. *Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811, 814 (1959). An accomplice is defined as "a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." *Clapp v. State,* 94 Tenn. 186, 30 S.W. 214, 216 (1895). To corroborate the testimony of an accomplice, "there should be some fact testified to, entirely independent of the accomplice's evidence, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it." *Clapp,* 30 S.W. at 216. This corroboration must consist of some fact or circumstance which affects the identity of the defendant.

Such corroborative evidence "may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction" so long as it "fairly and legitimately tends to connect the defendant with the commission of the crime charged." *State v. Gaylor,* 862 S.W.2d 546, 552 (Tenn. Crim.App.1992), quoting *Hawkins v. State,* 4 Tenn.Crim.App. 121, 469 S.W.2d 515 (1971). Furthermore, the corroboration may be sufficient although the "evidence is slight and entitled, when standing alone, to but little consideration." *Id.* Whether an accomplice's testimony has been sufficiently corroborated is a question for the jury. *State v. Bigbee,* 885 S.W.2d 797, 804 (Tenn.1994).

The defendant contends that Licari's testimony was not sufficiently corroborated. We cannot agree. "An accomplice's testimony is deemed sufficiently corroborated by evidence placing a defendant at the scene of the crime as described by the accomplice." *State v. Barnard,* 899 S.W.2d 617, 626 (Tenn.Crim.App.1994); *see also State v. Webb,* 625 S.W.2d 281, 284 (Tenn. Crim.App.1980). By his own testimony, the defendant places himself at the scene of the crime. Licari's testimony added the plan, the method, and the financial motive for the murder of the victim. The defendant's presence at the murder scene is sufficient corroboration, and the testimony of Licari supplies the evidence necessary to support the jury verdict. *See State v. Bragan,* 920 S.W.2d 227 (Tenn.Crim.App.1995).

We also find meritless the defendant's argument that the verdict is erroneous because the jury ignored the impeachment of Licari. It is the exclusive job of the jury to judge the credibility of the testimony of witnesses. *Bigbee,* 885 S.W.2d at 804. The jury chose to credit the testimony of Licari, which in its sole discretion, it may choose to do. The defendant's challenge to the sufficiency of the evidence is without merit.

In his second issue, the defendant contends that the verdict was based upon passion and prejudice because the jury deliberated less than an hour. The defen-

dant states that the jury could not have possibly evaluated all the evidence in the forty-nine minutes that it deliberated. The length of a jury's deliberation has no bearing on the "strength or correctness of [its] conclusions or the validity of [its] verdict." *Anglin v. State,* 553 S.W.2d 616, 620 (Tenn.Crim.App.1977). *See also State v. Caldwell,* 656 S.W.2d 894 (Tenn.Crim.App.1983)(finding no indication of a predisposition against the defendant where jury deliberated for twenty-six minutes before finding guilt). This issue is without merit.

■ In his third issue, the defendant argues that the trial court erred when it did not admonish the State for a remark made during the district attorney's closing argument. The defendant argues he was prejudiced by the statement to the jury, "Give him time. Give him another chance, see what he can do next time. How many more can be bring down here. How many prison friends has he got." The defendant failed to make a timely objection to this statement during the trial, therefore, this issue has been waived.

■ In his fourth issue, the defendant contends that the trial court erred when it refused to grant the defendant's request for a recess prior to the cross-examination of Licari. Licari was the first witness to testify on the second day of trial. According to the defendant, the direct examination of Licari lasted until approximately 10:10 a.m. Upon the conclusion of the cross-examination, the defendant asked the court for a short break. The court refused, saying "get on with it." Cross-examination of Licari then lasted until 11:40 a.m. at which time the jury was excused for lunch.

The defendant argues that the court's denial of a recess had a detrimental effect on the effectiveness of his counsel. However, in his brief, the defendant admits that his counsel did not state to the court that he would be ineffective if a recess were not granted.

The defendant offers no explanation in his brief as to how defense counsel's effectiveness was diminished, and we find no evidence in the record to even suggest that counsel's performance was in any way impaired. This issue is without merit.

■ In his fifth issue, the defendant contends that the court erred when it admonished the defendant in the presence of the jury. During the defendant's direct testimony, the State made an objection which was sustained by the court. However, the defendant continued to answer the question despite the sustained objection. At that time, the court instructed the defendant that "when there's an objection you get quiet. Do you understand that?" In his brief, the defendant states that this remark was improper because a trial judge should not indicate to the jury any conclusions of guilt. The statement by the court is hardly an indication of any conclusions of guilt. The court simply instructed the defendant that he must not continue answering the question when an objection has been made. Providing such instruction is a duty of the court. This issue is without merit.

■ In his sixth issue, the defendant argues that the court erred by not charging the jury with the lesser included offense of facilitation of first degree murder. The jury was charged on first degree murder, second degree murder, and manslaughter only. The defendant contends that facilitation of murder should have also been charged. However, the defendant failed to raise this issue in his motion for new trial.[2] In *Harrison v. State,* 532 S.W.2d 566 (Tenn.Crim.App.1975), this Court held that the failure to raise this very issue in a motion for new trial waived the issue on appeal. We stated that unless the trial court were given an opportunity to address the issue through a motion for new trial, then the issue will not be considered on appeal. *Harrison* at 569. *See* T.R.A.P. 3(e). Thus, the defendant has waived this issue.

---

2. The defendant filed his motion for new trial on July 24, 1995. The failure to charge the jury with the lesser included offense was not cited as error. The motion was denied on August 1, 1995. The defendant then entered his notice of appeal. On January 2, 1996, the defendant filed a second motion for new trial based on newly discovered evidence of alleged jury misconduct. The defendant listed the additional issue of failure to charge a lesser included offense. This issue did not involve newly discovered evidence. The defendant should have raised the issue in his first motion for new trial. Because he failed to do so, the issue is waived.

Nonetheless, we will address the merits of his argument. "[A]n offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser." *Howard v. State,* 578 S.W.2d 83, 85 (Tenn.1979). However, only when there is some evidence upon which reasonable minds could convict the defendant of a particular lesser offense is the court required to instruct regarding that offense. *Johnson v. State,* 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Atkins,* 681 S.W.2d 571, 577 (Tenn.Crim.App.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

·In this case, there was no need for an instruction on the lesser included offense of facilitation of murder because such an offense was not supported by the evidence. A person is responsible for the facilitation of a felony if "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39–11–403. Facilitation of first degree murder was not raised by the proof of the State or the defendant. The State offered proof that the defendant and Licari had entered into an agreement with Ms. Burns to kill the victim, that they made a plan to carry out the murder, and that the defendant participated in the murder by slashing the victim's throat. On the other hand, the defendant offered proof that he did not know Licari was planning to kill the victim nor did he aid in the killing. Instead, the defendant testified that he was simply driving the car when he suddenly heard the victim choking. He further testified that he had nothing to do with the murder and even tried to leave the scene but that Licari would not let him.

Neither the State's proof nor the defendant's proof raises sufficient evidence upon which reasonable minds could convict the defendant of facilitation of murder. This issue is without merit.

As his seventh issue, the defendant contends that the trial court erred when it determined that the defendant was not preju-diced when two jurors left the hotel where they were being sequestered. The defendant contends that the jurors left the hotel, walked to a nearby convenience store, purchased and consumed an alcoholic beverage. An evidentiary hearing was held to determine whether any prejudice to the defendant had occurred. The trial court concluded none had occurred and we agree.

At the hearing, the two jurors, one of which was an alternate and did not even participate in the deliberations, testified that they had left the hotel to purchase a beer at a Shell Station some seventy-five yards away from the hotel. Both men said that while away from the hotel they did not speak to anyone about the case nor did they come in contact with printed or broadcasted material about the case. They were gone from the hotel for less than ten minutes.

It is well-settled in Tennessee that once jury separation has been shown by the defendant, the State then has the burden of showing that such separation did not result in prejudice against the defendant. *Gonzales v. State,* 593 S.W.2d 288 (Tenn. 1980). " 'It is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial, but if such separation afforded no such opportunity, there can be no cause for a new trial.' " *Gonzales,* 593 S.W.2d at 291, *quoting Cartwright v. State,* 80 Tenn. 620 (1883). The burden is on the State to offer a satisfactory explanation as to why there was a jury separation and that the separated juror had no communications with others, or that if communications were had, they did not relate to the case at trial. *Gonzales,* 593 S.W.2d at 291–92.

In this case, the State showed that the two jurors left sequestration for the purpose of purchasing two beers. At the evidentiary hearing, the State offered the testimony of these witnesses to show that they did not communicate with anyone about the trial. One juror testified that he did speak to the clerk of the convenience store but that he did not communicate with her about the trial. Furthermore, the other juror, the alternate, testified that he waited outside the store and

spoke to no one. Thus, the State met its burden of affirmatively showing that no prejudice occurred while the jurors were separated.

In addition to breaking sequestration, the defendant alleges that these same two jurors, who were roommates at the hotel, discussed the case prior to deliberations. At the hearing, the jurors testified that they may have discussed things that happened in court that day, but that they did not discuss a possible verdict.

Federal Rule of Evidence 606(b) has been expressly adopted as the rule governing the exclusion and admissibility of evidence to impeach a jury verdict in Tennessee. *State v. Blackwell,* 664 S.W.2d 686 (Tenn.1984). The rule provides that a jury's verdict may be challenged only on a showing that jurors received "extraneous prejudicial information" or that "outside influence" was improperly brought to bear upon any juror. *State v. Frazier,* 683 S.W.2d 346, 353 (Tenn.Crim. App.1984). In *Frazier,* this Court said that an alleged discussion by members of the jury prior to the case's conclusion does not constitute either of these and therefore such an issue is improper for consideration on appeal. Thus, the defendant's final issue is without merit.

For the reasons set forth in the discussion above, the judgment of the trial court is affirmed.

SUMMERS and HAYES, JJ., concur.