IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 5, 2002 Session

**MICHAEL JOSEPH SPADAFINA v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Benton County**
**No. CR451     Julian P. Guinn, Judge**

------

**No. W2001-02554-CCA-R3-CD  - Filed December 20, 2002**

------

The petitioner appeals from the denial of his writ of error coram nobis.  In this appeal, he argues his first degree murder conviction should be set aside because his co-defendant, who testified against the petitioner at trial, recanted his testimony prior to the co-defendant's death.  Following a hearing, the trial court denied the petition.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Victoria L. DiBonaventura, Paris, Tennessee, for the appellant, Michael Joseph Spadafina.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Beth C. Boswell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 1995, the petitioner was convicted of first degree murder and sentenced to life imprisonment.  This court affirmed his conviction.  *See* State v. Spadafina, 952 S.W.2d 444 (Tenn. Crim. App. 1996), *perm. to app. denied* (Tenn. 1997).  The petitioner then filed a petition for post-conviction relief, which was denied; the denial was affirmed on appeal.  *See* Spadafina v. State, 77 S.W.3d 198 (Tenn. Crim. App. 2000).  On May 16, 2001, the petitioner filed a "Motion for New Trial" alleging there was newly discovered evidence showing Vito Licari, a co-defendant who testified against the petitioner, had recanted his trial testimony.  The trial court treated the motion as a writ of error coram nobis.  Following an evidentiary hearing, the trial court found no grounds for relief and denied the petitioner's motion.

## I. FACTS PRESENTED TO THE JURY

The following facts are set out in this court's opinion on the direct appeal of the petitioner's conviction:

On December 15, 1994, a child looking out his school bus window discovered a body lying atop an embankment along Mt. Carmel Road in Benton County. Police and medical personnel arrived shortly thereafter and found a man lying face down with his arms stretched above his head. His neck had been almost completely severed. A hotel key to a room at Wismer Motel was the only item in the victim's pockets.

Benton County Sheriff Bobby Shannon and another officer went to the motel and spoke to Brenda Burns who identified the key as belonging to her ex-husband, Paul Burns. Ms. Burns gave the officers a description of her ex-husband, and from the description, the officers determined that the unidentified body was likely Paul Burns. Ms. Burns told the officers that she had last seen the victim with the defendant and Vito Licari.

Shortly thereafter, the sheriff's office picked up Licari who was walking along Mt. Carmel Road carrying a large suitcase. When questioned about the defendant's whereabouts, Licari told officers that the defendant was taking an employment test in nearby Humphreys County. The defendant was located and taken into custody a few hours later. Both Licari and the defendant were then questioned about the death of the victim.

In his first statement to the police, Licari denied knowing anything about the murder. In the defendant's first statement to the police, he said that he, Licari and the victim had been in the victim's motel room when Licari began asking the victim for money. He further stated that Licari had then suggested that he (Licari) and the victim take a ride and that the two then left while the defendant had stayed in the room. According to the defendant, Licari returned alone a short time later and refused to say what had happened to the victim.

Upon obtaining the defendant's initial statement, the officers placed him in the same room as Licari and asked the defendant to repeat his version of the events. After doing so, both the defendant and Licari asked to make new statements. The two were then separated and Licari then claimed that he and the defendant together had murdered the victim. The defendant's new statement was that he had been in the car at the time the victim was killed but that he had

-2-

known nothing about Licari's intention to kill the victim nor had he aided Licari in doing so.

The grand jury subsequently indicted the defendant and Licari for first-degree murder. Licari pled guilty to first-degree murder in exchange for the State's agreement to a sentence of life imprisonment.

At trial, the defendant testified that he and the victim had known each other for some years while the two lived in New York. The victim, upon being relocated under the Federal Witness Protection Program, asked the defendant to join him in Tennessee. The defendant, his girlfriend, and her children moved to Tennessee in the summer of 1994, and in August, the victim began living with them. In October, after being invited by the defendant, Licari left New York and moved in with the defendant and the others. Licari and the defendant had met while incarcerated in the New York state penitentiary.

Licari testified that some time in December he and the defendant had met with Brenda Burns to discuss killing the victim, Ms. Burns' ex-husband. Licari alleged that Ms. Burns had hated the victim and did not want to pay him fifty thousand dollars ($50,000) she owed him as a result of their divorce settlement. According to Licari, Ms. Burns had offered to pay Licari and the defendant a total of ten thousand dollars ($10,000) if they would kill the victim. The plan was that Ms. Burns make an initial payment prior to the killing and then follow with an installment payment of eight hundred dollars ($800) per month. Licari testified that he and the defendant had agreed to murder the victim but that the defendant had wanted to collect some money owed him by the victim before committing the murder.

Licari testified that in the fall of 1994, the defendant had intentionally set fire to the victim's house so that the victim could collect the insurance proceeds. In exchange for committing the arson, the defendant was to receive five thousand dollars ($5,000) from the victim. According to Licari, the defendant had received a portion of the money but that the victim still owed him about two thousand three hundred dollars ($2,300).

Licari testified that on the day of the murder, he had driven the victim to Henry County to appear in court on charges stemming from a "check kiting" scheme in which Licari said he, the defendant and the victim were involved. While he and the victim were in court,

the defendant and Ms. Burns had picked up three insurance checks that were issued to the victim as a result of the fire. Licari testified that the three men had met back in the victim's motel room where the defendant had given the victim two of the three checks. Licari testified that the defendant had told the victim that the third check, which was for five thousand dollars ($5,000), would have to be picked up the next day. Actually, the defendant and Ms. Burns already had possession of the third check.

From the two checks, the victim paid the defendant the balance owed for the alleged arson. As for the third check, Licari said the defendant and Ms. Burns had forged the victim's signature and cashed it. From this five thousand dollars ($5,000), Ms. Burns paid the defendant one thousand five hundred dollars ($1,500) to be shared with Licari as a downpayment on the murder. Licari received his share later that same day. At that point, Licari testified that the defendant had decided they must kill the victim that night because if they did not, he would start asking about the third check. Licari and the defendant decided to kill the victim while they were all in the defendant's car after the defendant gave the signal, "Now would be a good time."

On the night of the murder, the three men had dinner together, dropped some food off at the defendant's house, and then drove down Mt. Carmel Road in the defendant's station wagon. When the defendant gave the signal, Licari, who was in the backseat, reached around the passenger seat and tried to choke the victim with a clothesline. Licari testified that when he had begun this attempt, the defendant pulled the car off the side of the road. Licari was unsuccessful at his attempt to choke the victim because the clothesline was in the victim's mouth rather than around his neck. According to Licari, the defendant got out of the car, came around to the driver's side, and slashed the victim's throat two or three times with a knife. Licari further testified that he and the defendant had then dragged the victim's body to the top of an embankment and left it there. The pair then went to a nearby carwash and sprayed the inside of the car with water in an effort to remove the blood. They also washed the blood from their shoes and from the knife. Licari then tossed the knife behind the carwash. According to Licari, the two had then returned to Wismer Motel where Ms. Burns washed their clothes.

Licari and the defendant then returned to the defendant's house where Licari told the defendant's girlfriend that a "problem" had been eliminated. Licari did not say that the victim had been

murdered, but he did tell the girlfriend that the defendant had not been involved in eliminating the so-called problem.

On December 15, 1994, Licari and the defendant went to Henry County for another of the victim's scheduled court dates. When the victim's attorney questioned them as to the victim's whereabouts, the defendant said he did not know where the victim was and indicated that the victim may have run. Later that same day, Licari and the defendant were separately picked up for questioning and were subsequently charged with the murder of Paul Burns.

The defendant's version of the events is quite different. At trial, he testified that on the day of the murder he and Ms. Burns had picked up the insurance checks but that they had done so with the victim's permission. He further testified that he had given all three checks to the victim and had then taken the victim to the bank so that the victim could pay some outstanding debt. The defendant testified that the victim had given him two thousand two hundred dollars ($2,200) to go toward a downpayment on the defendant's house, not as pay for an arson job as Licari had testified earlier. As for the third check, the defendant testified that the victim had asked Ms. Burns to sign his name to the check and then had asked that Ms. Burns and the defendant pay three thousand five hundred dollars ($3,500) of the five thousand dollar ($5,000) check on some other bank notes. The pair did as they were asked and then returned to the hotel with the remaining one thousand five hundred dollars ($1,500). The defendant testified that the victim had then given that money to Ms. Burns.

According to the defendant, he, the victim and Licari were later that evening riding in the defendant's car on Mt. Carmel Road. The defendant testified that he had suddenly heard the victim gagging in the seat next to him, and when he turned, he saw Licari choking the victim with a piece of cord. The defendant claimed that he tried to reach for the cord and as a result, ran his car off the side of the road. The defendant testified that Licari had then threatened him with a knife and demanded that he stop the car. He further testified that he stopped the car, got out, and began to leave the scene when Licari ordered that he return. When the defendant did so, he saw the victim fall out of the car. The defendant testified that Licari had threatened to kill him if he left and that Licari then pulled the victim's body to the top of the embankment.

The defendant testified that he and Licari had gone to the carwash and that they had returned to the Wismer Motel that night,

-5-

but claimed that they had not seen Ms. Burns. He further testified that he and Licari had returned to their home and spent the night despite the fact that Licari had continued to make threats to kill the defendant. Over the next few days, the defendant testified that Licari had always been by his side. He further testified that he had been in fear for his and his family's safety and that because of this fear he had been unable to tell the police that Licari had killed the victim.

Spadafina, 952 S.W.2d at 447-49.

## II. PROOF AT HEARING

At the hearing, the petitioner presented the testimony of James Bennett, a correctional officer, who testified he had served as Vito Licari's prison counselor. Bennett stated Licari, who suffered from AIDS, stopped taking his medication and, as a result, died approximately six months later. According to Bennett, after Licari stopped taking his medication, he approached Bennett, told Bennett he wanted to "clear the record," and recounted the murder of Paul Burns. Bennett said Licari told him he had cut the victim's throat, and the petitioner had no idea the murder was going to occur. Bennett testified Licari stated the petitioner helped him dispose of the body. Bennett stated Licari indicated he had been untruthful in his statements to law enforcement and in his testimony at trial. Bennett said he reported this information to his supervisor and the warden.

Bennett indicated the conversation with Licari occurred on or about March 4, 1999. Bennett testified he later met the petitioner and, in approximately August or September 2000, apprised him of his prior conversation with Licari. The petitioner was unaware of this conversation prior to being told by Bennett.

Terry Leonard, the attorney who represented the petitioner during trial, testified that after the trial, he learned of a letter purportedly written by Licari to the petitioner in which Licari admitted he lied during the trial. Leonard stated he visited Licari in prison and showed him a copy of the letter. According to Leonard, Licari responded with laughter and denied writing the letter. Leonard acknowledged he presented the testimony of three witnesses at trial who testified Licari said the petitioner had nothing to do with the murder.

The judge, who presided at petitioner's trial and at the hearing, questioned whether Licari, had he been alive, would have testified in accordance with the statements he made to James Bennett. The trial court also stated on the record that the petitioner's own testimony at trial was far more damaging to the petitioner than Licari's testimony. Finding no basis for relief, the trial court denied the petitioner's motion.

## III. WRIT OF ERROR CORAM NOBIS

Trial courts may grant a criminal defendant a new trial following a judgment of conviction under limited circumstances through the extraordinary remedy offered by a writ of error coram nobis. Tenn. Code Ann. § 40-26-105.; State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). A writ of error coram nobis may be granted where the defendant establishes the existence of newly discovered evidence relating to matters litigated at trial if the defendant shows he was without fault in failing to present the evidence at the proper time, and if the judge determines the evidence may have resulted in a different judgment had it been presented to the jury. Tenn. Code Ann. § 40-26-105; Mixon, 983 S.W.2d at 668.

## A. Statute of Limitations

A writ of error coram nobis must be filed within one year after the judgment becomes final in the trial court, which is thirty days after judgment is entered or, if a post-trial motion is filed, upon entry of an order disposing of the post-trial motion. Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 670.

In the instant case, there is no question that petitioner's motion, filed approximately five years after judgment was final in the trial court, was clearly outside the statute of limitations. However, our state's appellate courts have held due process may require that the statute of limitations for filing a petition for writ of error coram nobis be tolled. *See* Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001) (holding due process required tolling of the statute of limitations where "Workman's interest in obtaining a hearing to present newly discovered evidence that may establish actual innocence of a capital offense far outweighs any governmental interest in preventing the litigation of stale claims"); State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (holding due process required tolling of the statute of limitations where the petition was filed fourteen days late and the "great weight of the evidence against [the petitioner]" came from the victim, who recanted her testimony). While we question whether due process requires the statute of limitations be tolled for five years in the instant case, we note the state did not raise the statute of limitations as a defense in the trial court. Further, the trial court conducted an evidentiary hearing on the petitioner's motion. Because our review of the record brings us to the determination that the trial court did not err in dismissing the petitioner's claim for relief on the merits, we will not base our disposition on the statute of limitations.

## B. Writ of Error Coram Nobis for Recantation

A witness's recantation of his prior trial testimony may be newly discovered evidence. Mixon, 983 S.W.2d at 672. Before granting a new trial on the basis of newly discovered recanted testimony, the trial court must find: (1) it is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. Ratliff, 71 S.W.3d at 298 (citing Mixon, 983 S.W.2d at 673 n.17).

It lies within the sound discretion of the trial court to grant or deny a petition for writ of error coram nobis based upon newly discovered evidence. State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). This court will not overturn the trial court's decision to deny a writ of error coram nobis absent a showing that the trial court abused its discretion.

Given that Vito Licari is now deceased, this case does not involve the usual scenario in which a prosecution witness recants his or her trial testimony. Instead of being able to present the witness's recanted testimony, the petitioner was forced to present the testimony of James Bennett, to whom Licari made his alleged recantation. Nevertheless, we conclude that before the trial court could have granted the petitioner's request for coram nobis relief, it : (1) must have been reasonably satisfied that Vito Licari's testimony at trial was false and his "recantation" to James Bennett was true; (2) found the petitioner was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) found the jury might have reached a different conclusion had the truth been told. *See* Ratliff, 71 S.W.3d at 298.

First, the trial court implicitly found Licari's statements to Bennett lacked credibility. The facts presented at trial indicate Licari made inconsistent statements about the murder to law enforcement. *See* Spadafina, 952 S.W.2d at 447. Trial counsel Terry Leonard testified at the hearing that he presented the testimony of three witnesses who said Licari made statements which were inconsistent with his trial testimony. Leonard further testified that when he confronted Licari with the letter in which Licari purportedly admitted lying at trial, Licari laughed and denied making any such admission.

Second, the proof supports the trial court's conclusion that the statements made by Licari to Bennett would have had no impact on the outcome of the trial. The judge who presided at the hearing was present during the trial. He had the unique opportunity to view the evidence presented to the jury, which included the testimony of Licari and the petitioner, and evaluate whether the evidence presented at the hearing would have made a difference. We yield to the trial court's observation that it was the petitioner's own testimony at trial which left the jury "aghast" and weighed more heavily against him than the testimony of Licari. We also note that three witnesses at trial indeed testified that Licari previously said the petitioner had nothing to do with the murder.

The trial court was justified in denying relief for these reasons.

### III. ADMISSIBILITY OF EVIDENCE

Further, we note the evidence of Vito Licari's recantation of his trial testimony was, by necessity, presented through the testimony of James Bennett. Clearly, Bennett's testimony regarding Licari's statements was hearsay. *See* Tenn. R. Evid. 801(c). Therefore, before Bennett's testimony could be presented at a new trial, it must be found admissible under a hearsay exception. *See* Tenn. R. Evid. 802. Although the petitioner argues Licari's statements to Bennett qualify as a dying declaration, we would note that this exception to the hearsay rule applies only to statements made by a homicide *victim* who believes his death is *imminent* and that concern the *cause or*

*circumstances* of his impending death. Tenn. R. Evid. 804(b)(2). Therefore, Licari's statements do not meet the dying declaration exception to the hearsay rule.

The petitioner argues that the evidence qualifies as a statement against Licari's interest because it was an admission of perjury. *See* Tenn. R. Evid. 804(b)(3). However, it is questionable that a person with a terminal illness serving a life sentence would fear his alleged recantation could lead to significant criminal liability so as to qualify under this hearsay exception.

We conclude, under the circumstances of this case, the newly discovered evidence would not have been admissible at a new trial. Thus, it could not give rise to coram nobis relief.

## CONCLUSION

Accordingly, we must conclude the trial court did not abuse its discretion in denying the petitioner's writ of error coram nobis. We affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE