# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 24, 2012 Session

## STATE OF TENNESSEE v. JERRY ROMMELL GRAY

**Direct Appeal from the Criminal Court for Knox County**

No. 91603        Richard R. Baumgartner, Judge

---

**No. E2010-00637-CCA-R3-CD - Filed July 13, 2012**

---

A Knox County Criminal Court jury found the appellant, Jerry Rommell Gray, guilty of first degree felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. The trial court imposed a total effective sentence of imprisonment for life plus fifteen years. On appeal, the appellant argues that the trial court erroneously allowed the State to present fingerprint evidence in violation of Crawford v. Washington, 541 U.S. 36 (2004). The appellant also argues that the trial court erred in allowing the State to take additional fingerprints of the appellant during trial. Finally, the appellant contends that the trial court erred by failing to instruct the jury regarding accomplice testimony. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

John M. Boucher, Jr., Knoxville, Tennessee for the appellant, Jerry Rommell Gray.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Kevin J. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At trial, Donald Franklin Merritt testified that on April 30, 2009, at around 11:00 p.m. or midnight, he and his "common-law wife," Lisa Wakefield, drove Merritt's green car to the Woodland Avenue Laundromat to wash clothes for Wakefield's grandchild. The laundromat was located in a "strip mall" in North Knoxville, and Merritt and Wakefield were the only people there. While they waited for the clothes to dry, Merritt sat on a bench in front of the car. Wakefield got into the car and turned on the heater.

Merritt was reading a newspaper and talking with Wakefield when he saw two men walk past him. One of the men, later identified as the appellant, was wearing a gray hoodie and blue jeans. He was accompanied by a smaller black male, later identified as Brandon Deshawn Brown, who was wearing "baggies and a brown[, hooded] jacket." The two men came from the direction of Broadway. They walked past Merritt to the end of the building, turned, and came back. The appellant approached Merritt, and Brown went to the passenger's side of the car. The appellant pointed a long-barrel, .38 caliber revolver at Merritt's forehead and said, "I want your money." Merritt responded, "I'm sorry. I don't have any money. We scraped money to do the laundry." The appellant grabbed Merritt's eyeglasses and said, "[W]e'll just go over here and see." Brown used the butt of his gun to break the passenger window and reached into the car.

The appellant went to the driver's side of the car, and Merritt saw the appellant touch the driver's side door. Wakefield was sitting in the driver's seat. The appellant broke the driver's side window and apparently said something to Wakefield, but Merritt could not hear what was said. Wakefield leaned forward, and Merritt thought she was going to shut off the motor. Merritt then heard a gunshot. The only thing Merritt heard the two men say was "Let's go." Merritt said they ran toward Broadway.

Merritt said that Wakefield was lying on the console and that he could see a bullet hole in her back. Merritt flagged down a passing vehicle and asked the driver to call 911 on his cellular telephone. Merritt recalled that there had been about fifty cents in a cup in his car, but the change was not in the car when police returned the vehicle after the shooting. Merritt said that he did not know the appellant or Brown and that there was no reason for their fingerprints to be on his car.

Knoxville Police Officer Shawn Shreve testified that just prior to 2:00 a.m., he and his partner, Officer Steve Coffman, were dispatched to the Woodland Avenue Laundromat because of a reported shooting. When they arrived, they saw Merritt's car parked directly in front of the laundromat. The driver's side window was broken out, and Wakefield was "slumped over" the steering wheel. Wakefield showed no signs of life. Officer Shreve saw blood on the back of her shoulder, and she appeared to have been shot. Emergency medical

technicians arrived, removed her from the car, and transported her to the hospital. Officers Shreve and Coffman secured the crime scene.

Officer Shreve said that he had undergone firearms training and knew the differences between revolvers and semiautomatic pistols. He explained that "[a] revolver will have a cylinder that contains . . . the bullets and the projectiles, and you will load them, and the revolver will rotate. . . . [A]s one shot is fired you can cock the hammer and another shot will rotate into the firing position." He further explained that in a

> semiautomatic, the bullets themselves will be contained inside of a magazine. They are fed into the firing chamber of the gun. When the gun is fired, it will automatically eject that shell, whether it be by recoil from the gun or by gas pressure, and then after that one is ejected, another is automatically fed into the firing chamber.

Timothy Scott Schade testified that he was a crime scene investigator and certified print examiner in the Knoxville Police Department's forensic unit. He arrived at the crime scene at 2:36 a.m. Schade collected evidence, including fingerprints from the car. The two best fingerprints he retrieved were from the driver's side door. He entered the two prints into the automated fingerprint identification system (AFIS) and requested the system provide him with a list of thirty possible matches. Thereafter, Schade manually compared the fingerprints taken from the scene with the possibilities provided by AFIS and determined that the fingerprints matched the appellant's left thumb. Dan Crenshaw, Schade's "backup," verified the match made by Schade. Schade later took fingerprints from the appellant, compared them with those on file with AFIS, and determined that they matched. Subsequently, Schade was informed that Brown was also a suspect in the crime. Schade found Brown's fingerprints on the passenger's door.

Schade noted that both the driver's side window and the passenger's side window of Merritt's car were broken. On the asphalt outside the passenger's door, Schade saw broken glass, a "live" .380 caliber Winchester automatic bullet, and a "base plate of a [semiautomatic pistol's] magazine."

Investigator Patricia Beeler Tipton arrived at the crime scene in the early morning hours of May 1, 2009. She retrieved the laundromat's security video; however, due to the poor quality of the video, she was unable to clearly see the suspects' faces. After being advised by Schade that the appellant was a suspect, Investigator Tipton issued an "all points bulletin" for the appellant. She also notified media outlets, and the appellant's picture was shown on television. On July 15, 2009, the appellant was found by United States Marshals

in Oklahoma.  Investigator Tipton said that police did not recover the weapon used in this case.

Brandon Brown, who was twenty-one years old at the time of trial, testified that he started "hanging out" with the appellant in the summer of 2008 after Brown graduated high school.  Brown said that on the night of the shooting, he was wearing "some dickies and a T-shirt and a hoodie."  The appellant was wearing a hoodie and blue jeans.  Brown had a black and chrome .380 caliber semiautomatic with a magazine, and the appellant had a .357 caliber revolver.  Ronald Nelson, who was driving them around, dropped off the appellant and Brown at a side street near the Woodland Avenue Laundromat so they could rob someone.  The appellant and Brown walked around the side of the laundromat and saw Merritt and Wakefield.  The appellant approached Merritt, who was sitting on a bench.

Brown approached the passenger's side of the car, and Wakefield moved from the passenger's seat to the driver's seat.  Brown was unable to open the door so he used the butt of his gun to shatter the window.  The butt or clip of the gun broke, and the bullets fell into the passenger's side floorboard.  Brown reached into the car to retrieve the bullets and saw Wakefield trying to put the car into drive.  The appellant was on the driver's side of the car, and Brown heard a gunshot coming from the driver's side window. Wakefield slumped over, and Brown backed out of the car.  The appellant and Brown separated and ran away, and Brown eventually went home.  Brown denied taking change from the car.

Brown said that the following Thursday or Saturday, he and the appellant were "chilling" at a friend's apartment in Townview.  As they were watching television, they saw the appellant's picture on the news and heard that he was a suspect in the shooting.  Brown stated that the appellant's reaction was "[n]ot too good."  Brown and the appellant went to Brown's residence, and someone brought the appellant bags of clothing.  Brown believed the appellant was preparing to return to Oklahoma.

On cross-examination, Brown stated that on May 13, police arrested and interviewed him.  For the first six hours of the interview, Brown denied having any involvement in the robbery or shooting.  However, Brown eventually conceded his participation in the crimes and implicated the appellant.  Brown denied that Nelson, who he estimated was approximately six feet tall, was the shooter.  Brown stated that at the time of trial, he had not been convicted of any offense in connection with the instant crimes.  However, he acknowledged that he and the State had reached an agreement for him to plead guilty to facilitation of felony murder in exchange for a sentence of twenty-five years.

Dr. Steven C. Cogswell, the deputy chief medical examiner for Knox County, testified that he performed an autopsy on Wakefield.  Dr. Cogswell said that he found a gunshot

wound on the back of Wakefield's left shoulder and that the wound had irregular edges. He described the entrance wound as atypical. Next to the wound were abrasions "consistent with side window glass impacting the body and causing it's own kind of stippling." Dr. Cogswell was unable to determine the distance from which the shot was fired. As the bullet progressed through the body, it ultimately hit the aorta, causing Wakefield to essentially bleed to death.

The appellant testified that he was raised in Oklahoma and that he had lived in Knoxville for five or six years. He stated that on the night in question, he was with Brown, who had a small, black pistol, and Nelson, who had a large revolver. The appellant said that he did not have a gun. The three men were driving around, smoking marijuana, and drinking. Nelson and Brown said, "[W]e about to go rob somebody." Nelson pulled into the parking lot at the Woodland Avenue Laundromat, and all three men got out of the car. The appellant said that "they started to progress. I left, and . . . I didn't want nothing to do with that." He said that he did not know how his fingerprints got on the car, because he did not recall touching the car. The appellant said that when he saw his "face" on the news, he got scared and started thinking about his children. Therefore, he decided to return to Oklahoma to see them before anything happened to him.

The appellant said that Brown "looked at" Nelson like an uncle. He stated that Brown was afraid of Nelson and "wanted to show him that he was half the man he was." The appellant asserted that he had nothing to do with the shooting or the robbery.

On cross-examination, the appellant acknowledged that Brown and Nelson stopped at the laundromat because they planned to rob someone, and they saw Merritt sitting outside. Nelson parked in the laundromat's parking lot with his vehicle facing the street for an easy getaway. The appellant initially agreed to go along with the plan to commit a robbery. He was walking five paces behind the other men and saw Brown walk to the car and Nelson approach Merritt. When the appellant was "more than halfway" to Merritt's car, he changed his mind and ran away. The appellant said that he "heard a faint distant echo of a gunshot."

The appellant stated that he did not touch Merritt's car that night. However, he surmised that he possibly could have touched Merritt's car in a store parking lot three or four days prior to the shooting, mistakenly believing the car belonged to a friend. The appellant asserted that he believed Brown lied about the appellant's involvement because the appellant was not from Tennessee and because Brown "feels inferior to . . . Ronnie Nelson."

The jury found the appellant guilty of felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. On appeal, the appellant contends that the trial court violated Crawford v. Washington, 541 U.S. 36 (2004), by allowing the State to present fingerprint evidence; that the trial court erred when it allowed the State to take additional

fingerprints of the appellant during trial; and that the trial court erred by failing to instruct the jury regarding accomplice testimony.

## II. Analysis

### A. Timeliness of Motion for New Trial

Initially, we note that the State contends that the appellant has waived his issues by failing to raise them in a timely motion for new trial. Rule 33(b) of the Tennessee Rules of Criminal Procedure provides that a motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." This provision is mandatory, and the trial court has no authority to extend the time for filing. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). An untimely motion for new trial "not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." Martin, 940 S.W.2d at 569.

The record reflects that the appellant's trial concluded with a guilty verdict on February 24, 2010. A sentencing hearing was held on June 18, 2010, and the judgments of conviction were entered the same day. On March 8, 2011, the appellant filed a motion for new trial, well-beyond the thirty-day time limit for filing such motions. The trial court correctly determined that it was without jurisdiction to hear the untimely motion. We agree with the State and the trial court that the appellant's motion for new trial was untimely.

Because a late-filed motion for new trial does not toll the time for filing a notice of appeal, an untimely motion for new trial often also results in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). However, in the instant case, the appellant filed his notice of appeal on March 15, 2010, before the judgments of conviction were entered. Rule 4(d) provides that "[a] prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R. App. P. 4(d). Therefore, the appellant's notice of appeal was timely.

### B. Plain Error

Because the appellant's motion for new trial was not timely filed, "all [his] issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e); Martin, 940 S.W.2d at 569). However, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new

-6-

trial or assigned as error on appeal." <u>See also</u> Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

<u>State v. Adkisson</u>, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); <u>see also</u> <u>State v. Smith</u>, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the <u>Adkisson</u> test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." <u>Adkisson</u>, 899 S.W.2d at 642 (internal quotations omitted). We will briefly examine the appellant's issues for plain error.

## 1. Fingerprint Evidence

First, the appellant argues that the trial court violated <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), by allowing the State to present evidence regarding the "fingerprint card" that was on file with AFIS via Specialist Schade's testimony that the appellant's AFIS fingerprints matched the fingerprints found at the scene of the crime. The record reflects that on the day of trial, the appellant filed a motion seeking to suppress the appellant's "fingerprint card," arguing that the use of the card violated <u>Crawford</u>. The trial court denied the motion. Nevertheless, the State moved the trial court to allow Schade to "roll" the appellant for fingerprints at the motion hearing so Schade could verify that the appellant's "fingerprints match what was on the card." The court granted the State's motion.

At trial, Schade testified that the appellant was developed as a suspect by comparing the fingerprints on file with AFIS with two fingerprints taken from the driver's side of the car. Schade further stated that he fingerprinted the appellant and verified that the fingerprints matched those on the card that was on file with AFIS and with the fingerprints found on the driver's side of the car.

On appeal, the appellant again maintains a <u>Crawford</u> violation, contending that "[c]learly, fingerprint cards and the documents relating to any analysis of said prints is testimonial in nature, and would require that the Defense be provided the opportunity to subject said testimony to the 'crucible of cross-examination.'" In <u>Crawford</u>, the Supreme Court analyzed the Sixth Amendment right to confrontation and drew a distinction between the admission of testimonial and nontestimonial hearsay. The Court explained that the

admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny; however, the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. Crawford, 541 U.S. at 68. As we stated earlier, Schade, who examined and compared the fingerprints from the car, AFIS, and the appellant, testified at trial and was subject to thorough cross-examination by the appellant. Therefore, we conclude that the appellant is not entitled to relief.

The appellant also summarily argues that his

> due process rights to a fair trial were violated when the [trial court] forced him to submit to an additional fingerprint "roll" during trial. The defense can think of no greater violation of [the appellant's] due process rights than to indict him, seat and swear in a jury, and then force him to submit and give evidence that may be used against him at the trial that is already ongoing.

As we stated earlier, the record reflects that during a motion hearing immediately prior to trial, the trial court granted the State permission to take new fingerprint exemplars from the appellant. Therefore, the record belies the appellant's contention that the appellant's fingerprints were taken "during trial" after the trial court "seat[ed] and sw[ore] in a jury." Nevertheless, we note that our supreme court has previously discerned no constitutional error in "requiring a defendant to provide fingerprints [even when] in the presence of the jury." State v. Cole, 155 S.W.3d 885, 899 (Tenn. 2005). Specifically, our supreme court has noted that

> [f]ingerprinting, unlike being handcuffed or wearing an inmate's uniform, does not portray the defendant as a dangerous criminal. As noted by this court over twenty years ago, fingerprinting is a commonplace practice which "signifies neither criminality nor saintly living."

Id. (quoting State v. Tyson, 603 S.W.2d 748, 753-54 (Tenn. Crim. App. 1980)). Accordingly, we conclude that the appellant has failed to demonstrate plain error.

2. Jury Instructions

Finally, the appellant contends that the trial court "erred in failing to give the '[a]ccomplice [t]estimony' [i]instruction to the [j]ury when requested to do so by [the appellant]." The appellant does not specifically elucidate his complaint regarding the lack of an accomplice instruction. However, the only possible complaint we can discern is that

the jury should have been instructed that accomplice testimony needs corroboration. Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). Because Brown was arrested and indicted for the same offenses as the appellant, he is an accomplice as a matter of law. See State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001).

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App.1994). The appellant maintains that defense counsel requested the accomplice instruction "in chambers during the instruction review." However, the record before us contains no such request, either written or verbal. In the event the appellant properly requested the instruction, the trial court should have instructed the jury that accomplice testimony must be corroborated.

Nevertheless, our law provides that in order to find that an accomplice's testimony has been corroborated,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

Henley v. State, 489 S.W.2d 53, 56 (Tenn. Crim. App. 1972). "The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration." State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Additionally, such corroborative evidence may be direct or circumstantial. See State v. Spadafina, 952 S.W.2d 444, 450 (Tenn. Crim. App. 1996).

The evidence at trial revealed that Brown's testimony was corroborated by Merritt, Dr. Cogswell, and the fingerprint evidence. Merritt's testimony about the events that transpired that night substantially mirrored Brown's testimony. Further, the doctor's testimony confirms Brown's assertion that the gunshot was fired from the driver's side window. Finally, the appellant's fingerprints were found on the driver's side of the car, and Brown's were found on the passenger's side. Even without Brown's testimony, the testimonies of Merrit and Dr. Cogswell and the fingerprint evidence would have been

sufficient to convict the appellant of the offenses. Accordingly, we conclude that the trial court did not commit plain error by failing to give the instruction regarding accomplice testimony.

### III. Conclusion

In sum, we conclude that the appellant waived his appellate issues by failing to preserve them in a timely motion for new trial. Moreover, having examined his issues, we conclude that the appellant is not entitled to plain error relief. Therefore, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE