# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 9, 2012

## STATE OF TENNESSEE v. DOMINICK S. HODGES

**Direct Appeal from the Circuit Court for Montgomery County**
No. 41001252     Michael R. Jones, Judge

---

**No. M2011-02668-CCA-R3-CD - Filed March 28, 2013**

---

A Montgomery County Circuit Court Jury convicted the appellant of the felony murder and attempted aggravated robbery of the victim, George Miller, Jr. The trial court imposed a total effective sentence of life imprisonment in the Tennessee Department of Correction with the possibility of parole. On appeal, the appellant challenges the trial court's denial of the appellant's motions to suppress the results of a buccal swab and testimony regarding DNA test results. He also contests the sufficiency of the evidence supporting his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Roger E. Nell, Clarksville, Tennessee, for the appellant, Dominick S. Hodges.

Robert E. Cooper, Jr., Attorney General and Reporter, David H. Findley, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Samuel Knolton and Steven L. Garrett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's charges stemmed from the acts of the appellant and his co-defendant, Corey Gilbert at the A&W Motel in Clarksville on July 22, 2009. At trial, the victim's father, George Miller, Sr., testified that in July 2009, the victim was twenty-one years old and was staying at the motel. The victim was athletic, weighed around 175 pounds, and was

approximately 6'4" tall.

Shawntay Evans testified that in July 2009, she was seventeen years old. Before the instant offenses, she did not know the appellant, but she had seen him "around." She met Gilbert through Shawntray Brown.

Evans said that Gilbert and Cassandra Santos talked about robbing the victim of money and drugs. Santos showed Evans text messages on Santos's cellular telephone regarding the plan, and Evans agreed to participate in the crime. She stated that the victim was not supposed to be harmed and that she did not think the victim had a gun.

On the night of July 21, 2009, Evans, Santos, Gilbert, the appellant, and "T-K" Kelly met at Evans's house on Hallbrook Road then left in Gilbert's black Impala. Evans stated that Kelly was not a participant in the robbery. While in the car, Evans saw that the appellant had a red bandana to cover his face and that Gilbert had a white bandana. Additionally, Evans noticed Gilbert and the appellant each had a gun; Gilbert's gun was larger than the appellant's. The group went to Lincoln Homes where the appellant unsuccessfully tried to swap his small gun for a larger one.

Afterward, the group went to a Kroger store that was within walking distance of the A&W Motel. Gilbert, the appellant, and Kelly got out of the car and went into the store, and Santos drove Evans to the A&W Motel to meet the victim. Evans said that she was supposed to help Gilbert and the appellant gain entry into the victim's motel room.

Evans stated that she had previously called the victim to tell him that she was coming to his motel room and that the appellant, Gilbert, and Santos knew she had made the call. When Evans arrived at the motel about an hour later, the victim was waiting for her in the back of his truck in the parking lot. They went into his room, talked, listened to music, and smoked marijuana for one or two hours. Evans said that she left the room and went to the parking lot. She left the door open to allow Gilbert and the appellant to get inside and sent them a text message to that effect. The men were waiting at the side of the motel and told Evans to go back inside the room. When Evans complied, she saw the victim sitting on the right side of the bed near the headboard. Evans sat on the left of the bed beside the victim and told him that Santos was coming to pick her up.

At that point, the appellant and Gilbert came into the room. The appellant, who was wearing a black hoodie and had a red bandana covering his face, came into the room first. Gilbert, who had a white bandana covering his face, was immediately behind the appellant. Evans saw the men approach the victim, and each used his gun to hit the victim. Evans did not see any blood. When the victim tried to stand, Evans ran out of the room.

-2-

Evans went to the parking lot where Santos was waiting in Gilbert's car. A couple of minutes later, the appellant and Gilbert got into the car. The car was parked beside some bushes near the Cumberland Grill, which was located beside the motel. The guns were thrown in the bushes, but Evans could not remember who discarded the guns. The appellant said that "he didn't know if he had shot the gun or if [it] had went off when he was hitting him." Gilbert said that he thought the gun had "gone off." Evans said that the appellant and Gilbert took marijuana from the victim.

Evans stated that after the incident, she knew police would interview her because there was a neighborhood rumor regarding the people involved in the robbery and shooting. Evans said that she ultimately gave two statements to Detective Timothy Finley. During the first statement, she told him that she was in the room with the victim when two men came in, hit her, and robbed the victim. She told Detective Finley that she ran out of the room and up the street, then called a friend to come get her.

After speaking with Detective Finley the first time, Evans told her mother the truth about her involvement in the crimes. Her mother made her feel guilty and convinced her to confess to Detective Finley. During her second statement, Evans told Detective Finley a version of events that was substantially the same as her trial testimony.

Evans said that after police learned of her involvement in the crimes, she was charged in juvenile court with first degree murder. At a hearing regarding the transfer of her case to adult criminal court, the decision was made to keep her case in juvenile court. Thereafter, Evans pled guilty in juvenile court to conspiracy to commit aggravated robbery.

On cross-examination, Evans said that in her first statement, she falsely told Detective Finley that she was not involved and that she did not know the perpetrators. Evans said that after the first statement, she spoke with her mother and another family member who advised her to tell the truth so she could feel better about what happened. Thereafter, Evans told Detective Finley the truth. Evans said that her case remained in juvenile court because she "cut a deal" with the State. She acknowledged that she spent one month in a detention center and was then placed on probation until she turned nineteen years old.

Evans stated that she thought she could assist with the robbery because the victim was "sweet on" her and would let her in his room. She said that after entering the motel room, she and the victim smoked a couple of cigar-sized "blunts" of marijuana. Evans maintained that she was of mixed race and had light skin.

Brittaney Wells[1] testified that in July 2009, she was fifteen years old and lived at the A&W Motel with her four brothers in room 119. She knew the victim by sight and knew that he drove a white SUV with tinted windows. She said that the victim typically parked his vehicle in front of his motel room, which was 116. She said that her room was located on the end, to the left of the victim's, on the side of the motel closest to the Cumberland Grill.

Wells said that late on July 21, 2009, she was in her room with her brothers and their friends. One of the friends went outside and approached a black Impala that was parked near room 116 and began talking with one of the two "light skinned" females in the vehicle. The other female got out of the car, talked with the victim, and went into his room with him. After the Impala left, the female stayed in the room with the victim for an hour or two.

Wells stated that around midnight, she heard something outside and believed someone was trying to steal her brother's bicycle. She and her brother went to the window, and Wells saw two African American men run past her room. The first man had a black bandana covering his face. She could not see the next man's face, but she noticed that he was bigger than the first man and that his hair was braided to his scalp in "plats" that were "long, like neck to shoulder length." Her brother ran after the men, and Wells went back to bed. Wells said that before she saw the men running, she heard a loud television and heard things, such as furniture, being thrown.

Wells said that she gave police a written statement. She said the police did not ask her specific questions and just told her to tell the truth. She acknowledged that she told police about one man running past her room but did not mention the other, explaining that she was not asked. Wells said that she did not see the black Impala again that night. She denied ever hearing a gunshot.

Clarksville Police Detective Timothy Finley testified that around July 22, 2009, he was dispatched to investigate a shooting death that occurred at the A&W Motel in Clarksville. When he arrived around 3:00 p.m., patrol officers had secured the scene in room 116. Detective Finley tried to go into the room, but a body was behind the door blocking access. After obtaining a search warrant, officers removed the door to the room. Detective Finley went into the room, observing that there was a bedroom, a closet, and a bathroom. The victim's body was lying face down directly behind the doorway, with visible wounds to the victim's head. The room was in disarray, furniture was overturned, a lamp was on the floor with its lampshade crushed, and blood was throughout the room. Detective Finley learned that the victim's white sport utility vehicle (SUV) was parked in front of room 116.

---

[1]In the record, Wells is also referred to as "Brittany Welch."

From the motel's registration records, Detective Finley discovered that Shaqueta Radford had originally rented the room. When Detective Finley spoke with Radford, she stated that she rented the room for the victim, who was a friend, because he lacked identification. Detective Finley learned the victim's name from Radford. Detective Finley learned that the victim had stayed in the room for approximately one month; Radford did not stay with him.

After Detective Finley interviewed Wells, police began searching for a black Impala with "rims" on it. Wells viewed a photograph lineup and identified Candice Ligon as a possible suspect. Wells also said a man was with Ligon that night.

Early in the investigation, Detective Finley interviewed Shawntay Evans. A day or two later, Evans and a family member returned to Detective Finley's office, and Evans revealed that she was in room 116 on the night of July 21, 2009, clearing Ligon as a suspect.

Detective Finley said that on July 24, 2009, he arrested Gilbert and charged him with the felony murder of the victim. After interviewing Evans, officers searched Gilbert's apartment.

Detective Finley also filed charges of felony murder and attempted aggravated robbery against the appellant. Detective Finley could not locate the appellant in Clarksville; however, several months later, he learned that the appellant had been arrested in Chicago, Illinois, and was in the Cook County Jail. Detective Finley and another officer went to Chicago and retrieved the appellant.

On July 26 2010, Detective Finley collected buccal swabs from the appellant and from Gilbert. He did not state the location where the collection of the samples took place.

On cross-examination, Detective Finley said that police never searched the appellant's residence because they could not "locate[] a residence that we could say was definitely his." Detective Finley said he showed Wells a photograph lineup to see if she could identify a "light skinned female" who was a suspect in the case. Wells identified Ligon, but Ligon had an alibi.

Detective Finley said that during the interview with Evans, she mentioned Kelly. Kelly later came to the police station and denied any involvement in the case, saying that he was with his brother at the time. Detective Finley acknowledged that he did not confirm the story with Kelly's brother. Detective Finley did not take any buccal swabs from Kelly.

Detective Finley said that he submitted seventy-seven items of evidence to the

Tennessee Bureau of Investigation (TBI) crime laboratory for testing. Thereafter, he received an email from the laboratory, asking him to narrow the number of items for testing. Detective Finley stated that in room 116, police found two digital scales; a clear, plastic bag containing crack cocaine; a gold ring; a gold watch; and $166 in cash.

Detective Finley stated that in Gilbert's apartment, police found a white bandana and ammunition for a .9 millimeter handgun and a .22 caliber handgun.

Detective Finley testified that when he arrested the appellant in November 2009, the appellant's hair was in "dreadlocks" and was unkempt. He explained that the appellant "had been in the Cook County Jail; [his hair] was kind of straggly but it was – had braids to it."

Clarksville Police Officer Frederick McClintock, a drug agent and crime scene investigator with the major crimes unit, testified that around 5:05 p.m. on July 21, 2009, he went to room 116 of the A&W Motel. Near the window and on the floor next to the bed, Officer McClintock recovered a magazine containing seven .45 caliber rounds. On top of the refrigerator was a pair of blue jeans. In the folds of the jeans, Officer McClintock found a .45 caliber shell casing. The shell casing appeared similar to those in the magazine. Officer McClintock collected as evidence some furniture, clothing, drugs, and drug paraphernalia. Additionally, he found one projectile and took a swab of the bullet.

On cross-examination, Officer McClintock said that a .45 caliber semiautomatic pistol and a revolver were found. He checked the pistol for a magazine and discovered it was missing. Next, he verified that no round was in the chamber.

Retired Clarksville Police Detective Gary Hodges testified that in 2009, he worked with the crime scene team as the primary photographer. On July 22, 2009, he photographed the crime scene at room 116 of the A&W Motel. While he and the crime scene team were there, they found a shell casing near the foot of the bed, a projectile on the bed, and they took swabs of the blood in the room. Police recovered a watch, a cellular telephone, a bag of crack cocaine, and a set of digital scales. Detective Hodges found a bloody palm print on the wall. He did not recover any guns from the room. He did not find any weapons close to the victim's body.

Police had a black Chevrolet Impala taken to the police's evidence room. Inside the glove box of the vehicle, Detective Hodges found a red bandana.

On cross-examination, Detective Hodges said that he processed the motel room for fingerprints. He stated that the digital scales and crack cocaine in the room were indicative of drug sales or use.

-6-

Clarksville Police Officer Joseph Scruggs testified that he worked in the K-9 unit. Around 7:00 p.m. on July 23, 2009, he and his police dog searched for handguns behind the Cumberland Grill. He found two guns, a revolver and a semiautomatic pistol, behind the restaurant's parking lot, under weeds, on a slight embankment. The pistol did not have a magazine in it.

Clarksville Police Investigator Will Evans testified that just after midnight on July 24, 2009, he performed a consensual search of Gilbert's residence, apartment B14 at 830 Peacher's Mill Road. At the residence, Investigator Evans found a white bandana inside a macaroni and cheese box that was in the kitchen trash can. He also found ammunition of different calibers, namely .22 caliber, .25 caliber, .32 caliber, and 9 millimeter; a cellular telephone; and a pair of blue jeans.

John Brently Davis, a forensic pathologist for Forensic Medical, testified that on July 23, 2009, he performed an autopsy on the victim's body. The victim had a gunshot wound on the left side of his head, as well as lacerations and blunt force injuries. Dr. Davis stated that the cause of death was the gunshot wound to the head. The gunshot wound was a close contact wound, which meant that the muzzle of the gun was pushed against the scalp when the gun was fired. Dr. Davis said that the aforementioned wounds would have bled profusely and that the victim would likely have been capable of some movement after the wounds were inflicted.

Dr. Davis did not recover any bullets or bullet fragments from the victim's body. A toxicology screen revealed the presence of marijuana in the victim's system, but the test revealed the presence of no other drugs. Dr. Davis testified that a blood sample was taken from the victim, the sample was dried, and it was preserved for DNA testing.

Emma Hawkins, a forensic autopsy technician, testified that after the victim's blood sample was taken, she sealed it in an envelope then later released the sample to Shana Allman, the evidence custodian for the Clarksville Police Department. Allman testified that she received the victim's blood sample from Hawkins on September 29, 2009. Allman secured the evidence until August 9, 2010, when she transferred the evidence to Greg Fort, a TBI evidence technician.

On July 27, 2010, Allman received from Detective Finley a kit containing a buccal swab that was taken from Gilbert. Allman kept the swab kit secure until she released it to Fort on August 2, 2010. On July 26, 2010, Detective Finley submitted into Allman's care a buccal swab taken from the appellant, and she kept the sample secure until releasing it to Fort. Allman testified that she kept a red bandana and a white bandana secure until she

released them to Fort on September 25, 2009.

Gregory Edward Fort testified that in July 2009, he was a forensic evidence technician in the evidence receiving unit of the TBI crime laboratory. On August 9, 2010, he received the victim's blood sample from Allman. On August 2, 2010, he received from Allman buccal swabs that had been taken from Gilbert and the appellant.

Suzann Lafferty, a special agent forensic scientist in the latent print unit of the TBI crime laboratory, testified that she was given known finger impressions of the victim, Gilbert, and the appellant. She identified Gilbert's prints on the black Impala. She was unable to find any other identifiable prints on the evidence submitted.

On cross-examination, Agent Lafferty stated that she was not supplied with known prints from Evans, Santos, or Kelly.

Steve Scott, who worked in the firearms identification unit of the TBI crime laboratory, testified that he examined the Hi-Point .45 caliber semiautomatic pistol and RG model 23 (RG) .22 caliber revolver that were found by police. The magazine containing .45 caliber ammunition that was recovered from the crime scene was the type of magazine typically used in Hi-Point firearms. Scott said that the magazine could hold a total of nine cartridges and that the pistol could carry one more in the chamber for a total of ten rounds.

Scott said that the fired cartridge casing recovered from the scene was from a Wolf Performance Ammunition Company (Wolf) .45 caliber round. He compared the cartridge with the rounds in the magazine. Two of the seven rounds were the same type, design, and brand as the spent cartridge. After test firing the weapon, he determined that the spent cartridge casing had been fired from the pistol. Scott stated that the projectile recovered from the crime scene was a .45 caliber bullet that was consistent with Wolf produced ammunition and was fired from the pistol.

Scott said that the revolver was capable of holding six rounds and that six .22 caliber cartridges were submitted with the revolver. He stated that the revolver had a lot of rust on the outside but that it was capable of being fired.

Agent Bradley Everett of the serology DNA unit of the TBI crime laboratory testified that he was given a blood sample from the victim and buccal swabs from the appellant and Gilbert. Agent Everett tested the red bandana and found a DNA mixture from at least three individuals. The major contributor was Gilbert. Agent Everett could not conclusively find DNA belonging to the victim or the appellant on the red bandana. Agent Everett said that he found the victim's blood on the white bandana. Additional DNA was found on the white

bandana.  Gilbert's DNA was not conclusively found, but he could not be excluded as a contributor.  Around a knot that was tied in the white bandana, Agent Everett found skin cells. Testing revealed that the cells contained a mixture of DNA from two contributors. The appellant was the major contributor.  Agent Everett tested the barrel of a .45 caliber pistol and found the victim's blood.

The State concluded its case-in-chief.  The appellant did not testify or present proof.

The jury convicted the appellant of the felony murder and attempted aggravated robbery of the victim.  On appeal, the appellant challenges the trial court's denial of the appellant's motion to suppress the results of a buccal swab and DNA test results and the sufficiency of the evidence supporting his convictions.

## II.  Analysis

### A.  Suppression of Evidence

As his first issue, the appellant contends that the trial court should have suppressed the results of the buccal swab.  He contends that although the swab was taken pursuant to a search warrant, the information contained in the affidavit underlying the search warrant failed to include critical facts which would have impacted the issuing judge's probable cause determination. Specifically, the appellant maintains that the affidavit did not identify the juvenile informant by name, that police knew the juvenile informant was Evans, that the affidavit implied that Evans was a "mere bystander," that the affidavit did not reveal that Evans had previously given police a false statement, and that it did not reveal that she had acknowledged her complicity in the incident.

The affidavit underlying the search warrant, which was prepared approximately one year after the offenses, stated that the appellant, Dominick Shon Dre Hodges, was in possession of evidence that could be obtained by a buccal swab, which would relate to the crime of first degree murder.  The affidavit provided the following factual support:

> At approximately 2:37 p.m. on July 22nd 2009 Officers responded to 1505 Madison St. the A&W Motel, room 116, on call of a subject lying on the floor blocking the door and blood on the bed.  Through the window to room 116, Officers could see what appeared to be blood on the bed and throughout the room, there was a body on the floor in front of the door. Officers opened the door far enough to see the subject on the floor and determined that the subject was deceased.

-9-

A witness told your affiant that he saw a black Chevy Impala drop off a female at room 116 at approximately 9:45 to 10:00 p.m. The witness said that the female entered room 116 with the black male that stayed in room 116.

Affiant interviewed a juvenile who identified Corey Gilbert and Dominick Hodges as the persons who entered room 116 with the intent to rob the victim, George L. Miller. The juvenile admitted being present when Gilbert and Hodges planned the robbery. During the robbery Miller was shot which resulted in his death. Information from the juvenile also led to the recovery of two hand guns behind 1503 Madison St.

Corey Gilbert was located and interviewed. Gilbert admitted to his involvement in the robbery of the victim. Gilbert also said that they drove to and from the motel in his Chevy Impala.

At the hearing, the parties stipulated that the juvenile informant was Evans, that she had initially denied her involvement to police but later acknowledged that she participated in the crimes by "setting up" the victim and that Evans received a very favorable plea agreement for her involvement in the crimes. Defense counsel complained that these material facts were omitted from the affidavit. Therefore, he asserted that the trial court did not have the necessary information to evaluate the credibility of the juvenile informant under State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989).

In its ruling, the trial court stated that although Evans was as involved in the crimes as the other participants, she got a "quite shocking" deal in juvenile court. The court also noted that the affidavit did not confirm or deny the juvenile's identity. Regardless, the trial court stated that it had to judge the sufficiency of the affidavit by looking at "its four corners." The court said that the issuing judge considered the juvenile to be "involved in this incident. That is, that he or she was present, not only when Gilbert and Hodges planned the robbery but was part of that." The court observed that the affidavit provided that information given by the juvenile regarding the location of the handguns had been confirmed by police. Further, Gilbert corroborated the juvenile's statement that he was involved in the robbery. Therefore, the court found that the affidavit provided sufficient probable cause for the issuance of the search warrant.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and

-10-

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The appellant asserts that the critical analysis of his issue "is not whether the information presented in the warrant established probable cause; but, rather, whether the information that was left out constitutionally affected the issuing judge's determination, negating the establishment of probable cause." The appellant says that the State omitted from the affidavit the name and gender of the juvenile and the juvenile's role in the crimes. The appellant maintains that Evans, who was most likely the juvenile in question, had credibility issues, noting she lied to police in her first statement, and, after cooperating with police, she received lenient punishment as a juvenile for her role in the crimes. The appellant contends, "The affidavit does not include anything about the credibility of the informant. To the contrary, everything that would call her credibility into question was kept from the issuing judge." The appellant complains the affidavit implies that the informant was a "mere bystander" not involved in the offenses.

In State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978), our supreme court held that

> there are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made.

This court has observed that the same rationale of the Little test extends to material omissions in an affidavit. See State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999). Nevertheless, "an affidavit omitting potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." Id. The appellant bears the burden of establishing the allegation of perjury or reckless disregard by a preponderance of the evidence. Id.

The appellant does not allege that the affidavit contained any false statements, only that there were omissions of fact which impacted the informant's reliability. However, the trial court found that the affidavit did not imply that the juvenile was a "mere bystander." Instead, the affidavit suggested that the informant was "involved in this incident." Further, the juvenile informant gave statements implicating her involvement in the crimes, and the statement against interest lent the information credibility. See State v. Moon, 841 S.W.2d 336, 340 (Tenn. Crim. App. 1992). Additionally, the police corroborated the juvenile's information regarding the location of the guns. The informant's statements were further corroborated by Gilbert acknowledging his involvement in the crime. Moreover, even if the affidavit had contained information regarding the informant's "sweetheart deal" with the State or about her initially giving a statement minimizing her involvement in the crimes, her statement was sufficiently corroborated to make it reliable. Accordingly, we conclude that the trial court did not err in ruling that the appellant was not entitled to the suppression of the search warrant and the resulting fruits of the search, namely the buccal swab. See Yeomans, 10 S.W.3d at 297.

## B. Admissibility of DNA Evidence

As his second issue, the appellant contends that the trial court should have excluded evidence that the appellant's DNA was found on the white bandana that was discovered at Gilbert's residence. He contends that the evidence was not sufficiently reliable to merit admissibility, maintaining that "the procedures, protocols, and personal judgment of the scientist [were not] sufficient to eliminate the analytical gap between the data and the opinion offered."

At the suppression hearing, Agent Everett explained the type of testing performed on the white bandana. Agent Everett testified that he used preliminary chain reaction (PCR) DNA testing, which was a method utilized throughout the United States. He stated that the machines used in testing were subject to routine maintenance and that his testing proficiency was audited on a biannual basis. Agent Everett said that his results were also subject to peer review.

Agent Everett said that there was some leeway for professional judgment in analyzing and interpreting the data derived from the testing process. However, he denied using his judgment to make his test results conform to a desired outcome.

At the conclusion of the hearing, the trial court stated that nothing in Agent Everett's testimony reflected that he had done anything incorrectly. Moreover, DNA evidence was generally considered reliable and admissible. Therefore, it found that the DNA evidence was admissible in the instant case.

-12-

The appellant argues that Agent Everett's testimony and test results did not meet the requirements of Tennessee Rules of Evidence 702 and 703 or McDaniel v. CXS Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997). He contends that at each step of the DNA testing process, the samples were subject to interpretation to fill in "analytical gaps" in data, rendering the results unreliable.

Generally, expert testimony must be both relevant and reliable before it may be admitted. McDaniel, 955 S.W.2d at 265. The trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). As such, this court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

We note that Tennessee Code Annotated section 24-7-118(b)(1)[2] provides that in a criminal trial,

> the results of DNA analysis . . . are admissible in evidence
> without antecedent expert testimony that DNA analysis provides
> a trustworthy and reliable method of identifying characteristics
> in an individual's genetic material upon a showing that the
> offered testimony meets the standards of admissibility set forth
> in the Tennessee Rules of Evidence.

See also State v. Scott, 33 S.W.3d 746, 758 (Tenn. 2000). Our supreme court has held that the PCR method of DNA testing falls under the definition of DNA analysis in Tennessee Code Annotated section 24-7-118(b). See State v. Begley, 956 S.W.2d 471, 476 (Tenn. 1997). We further note that Tennessee Code Annotated section 24-7-118(b)(2) provides:

> Nothing in this section shall be construed as prohibiting any
> party in a . . . criminal trial from offering proof that DNA
> analysis does not provide a trustworthy and reliable method of
> identifying characteristics in an individual's genetic material,
> nor shall it prohibit a party from cross-examining the other
> party's expert as to the lack of trustworthiness and reliability of
> such analysis.

Our supreme court has specifically stated that "'a party can challenge the reliability of a

---

[2]"Former § 24-7-117, concerning admissibility in evidence of DNA analysis, was transferred to § 24-7-118 in 2000." Tenn. Code Ann. § 24-7-117, Compiler's Notes.

particular test in any given case by a showing of sloppy handling of samples, failure to train the personnel performing the testing, failure to follow protocol, and the like.'" State v. Reid, 164 S.W.3d 286, 336 (Tenn. 2005) (quoting Begley, 956 S.W.2d at 478). However, "'[s]uch a challenge . . . will go to the weight, not the admissibility, of DNA evidence.'" Id. (quoting Begley, 956 S.W.2d at 478).

Agent Everett explained that the machines involved in testing were routinely maintained and operated accurately. Additionally, he stated that his testing proficiency was biannually audited and that he had passed every audit. Further, he stated that his work was subject to peer review and that his results in the instant case were confirmed. At trial, the appellant cross-examined Agent Everett regarding the accuracy and potential flaws in the testing process.

The trial court stated:

> I've listened very intently to Mr. Everett's testimony trying to follow his technical protocol. There are lots of machines and there are lots of people who – of course, who have access to these long before the TBI gets that, any piece of evidence.
>
> The testimony of Mr. Everett is based on his great deal of experience as well as his education, which was basically agreed that he was an expert. And as an expert he looks at these instruments, and he uses them daily, and he has to make these decisions that the numbers that he uses are correct. And I've, frankly, heard nothing today to suggest what he is doing is not correct.
>
> [DNA] is, according to our statute and used across the country, reliable information and reliable tests. So I believe it is admissible. We have a mixture. The Court had to learn a lot about DNA in the Paul Reid matter. That's been so many years I've forgotten it, but it is, according to our laws and the cases that have developed under that, very reliable information. So I will allow the State to use that in its case.

We conclude that the trial court did not err in ruling that Agent Everett's testimony about the DNA test results was admissible.

-14-

## C. Sufficiency of the Evidence

Finally, the appellant argues that the evidence was insufficient to sustain his convictions and that the trial court, as thirteenth juror, should have set aside the verdicts. This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it implicitly has in this case, our appellate review is then limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Therefore, we will address the appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was found guilty of felony murder and attempted aggravated robbery. As it applies to the instant case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). The appellant was also convicted of attempted aggravated robbery. Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

-15-

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Essentially, the appellant complains that Evans should not be believed because she is an accomplice to the crimes whose testimony was not corroborated. "An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). Evans pled guilty to conspiracy to commit aggravated robbery and freely admitted her complicity in the crimes. Therefore, she was an accomplice as a matter of law. See State v. Allen, 10 S.W.3d 286, 289 (Tenn. Crim. App. 1999).

Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." McKnight, 900 S.W.2d at 47. In other words,

there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

Henley v. State, 489 S.W.2d 53, 56 (Tenn. Crim. App. 1972). "'The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.'" State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999) (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Additionally, such corroborative evidence may be direct or circumstantial. See State v. Spadafina, 952 S.W.2d 444, 450 (Tenn. Crim. App. 1996). Whether sufficient corroboration exists is a question for the jury as the trier of fact. See State v. Robinson, 239 S.W.3d 211, 230 (Tenn. Crim. App. 2006).

In the instant case, Evans testified that she joined the appellant, Gilbert, and Santos in a plan to rob the victim of money and drugs. They met at Evans's house prior to the robbery. Santos drove Gilbert's black Chevrolet Impala, left the men at a Kroger store, and took Evans to the motel where the victim was staying. Evans said the victim met her in the parking lot then led her into his room where they smoked marijuana. A toxicology report reflected that the victim's blood tested positive for marijuana. Further, Wells confirmed that she had seen a black Impala in the parking lot, that two women were in the car, and that one of the women went into the motel room with the victim. Evans sent the appellant and Gilbert text messages to let them know they could enter the room and saw them enter the room. The appellant carried a .22 caliber revolver and wore a red bandana covering his face, and Gilbert carried a .45 caliber semiautomatic pistol and wore a white bandana covering his face. Evans saw the men hit the victim with their guns, then she ran outside and got into the Impala. The men quickly followed Evans. Wells saw two black men, one of whom was wearing a dark bandana covering his face, run past her motel room. Wells said that one of the men had braided hair. Detective Finley confirmed that the appellant's hair was braided at the time of his arrest. Before Santos, Evans, the appellant, and Gilbert left the parking lot, they discarded the guns in some nearby bushes. Evans later told police where the guns could be found, and police found the guns at the location. Additionally, testing revealed that the victim's blood and the appellant's skin cells were on a white bandana that was found in Gilbert's residence. We conclude that Evans's testimony was sufficiently corroborated and that the foregoing evidence was sufficient for a reasonable jury to find the appellant guilty of felony murder and attempted aggravated robbery.

### III. Conclusion

In sum, we conclude that the trial court did not err in failing to suppress the buccal swabs or in admitting the DNA test results. Further, the evidence is sufficient to support the appellant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-17-